**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

SHERRYANNE L. CHRISTIE,
FKA Sherryanne L. St. Cyr,
*Defendant-Appellant.*

No. 14-10233

D.C. No.
1:13-cr-00889-LEK-1

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

ROGER CUSICK CHRISTIE,
*Defendant-Appellant.*

No. 14-10234

D.C. No.
1:10-cr-00384-LEK-1

OPINION

Appeal from the United States District Court
for the District of Hawaii
Leslie E. Kobayashi, District Judge, Presiding

Argued and Submitted October 16, 2015
Honolulu, Hawaii

Filed June 14, 2016

Before: Diarmuid F. O'Scannlain, Richard C. Tallman,
and Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge O'Scannlain

---

### SUMMARY[*]

---

### Criminal Law / RFRA

The panel affirmed the convictions of two ministers of the Hawaii Cannabis Ministry for violations of the Controlled Substances Act (CSA) in a case in which the defendants claim that their convictions violate their rights freely to exercise their religion, as guaranteed by the Religious Freedom Restoration Act of 1993 (RFRA).

The panel held that the government has a compelling interest in mitigating the risk that cannabis from the Ministry will be diverted to recreational users, and that the facts of this case demonstrate that mandating the defendants' full compliance with the CSA would help to advance this compelling interest to a meaningful degree. The panel held that in light of these defendants and the facts in this record, the government could not achieve its compelling interest in mitigating diversion through anything less restrictive than mandating the defendants' full compliance with the CSA. The panel therefore rejected the defendants' RFRA defense.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Rejecting the defendants' contention that RFRA is unconstitutionally vague, and thereby renders the CSA unconstitutionally vague, the panel explained that the Fifth Amendment has no application to RFRA, which is not a penal statute or anything like one.  The panel held that the defendants' appeal to the rule of lenity is equally untenable. The panel rejected as foreclosed by precedent the defendants' contention that the CSA's classification of marijuana as a Schedule I controlled substance violates the Due Process Clause of the Fifth Amendment.

The panel held that the district court did not abuse its discretion in issuing wiretaps in the course of investigating the Ministry, and that the district court's determinations in denying the defendants a *Franks* hearing were not clearly erroneous.

**COUNSEL**

Thomas M. Otake (argued), Law Office of Thomas M. Otake, Honolulu, Hawaii, for Defendant-Appellant Roger Cusick Christie.

Georgia K. McMillen (argued), Law Office of Georgia K. McMillen, Wailuku, Hawaii; Lynn E. Panagakos, Law Office of Lynn E. Panagakos, Honolulu, Hawaii, for Defendant-Appellant Sherryanne L. Christie.

John M. Pellettieri (argued), Attorney, Appellate Section; Leslie R. Caldwell, Assistant Attorney General; Sung-Hee Suh, Deputy Assistant Attorney General; United States Department of Justice, Criminal Division; Florence T. Nakakuni, United States Attorney; Michael K. Kawahara, Assistant United States Attorney; United States Attorney's Office, Honolulu, Hawaii; for Plaintiff-Appellee.

---

**OPINION**

O'SCANNLAIN, Circuit Judge:

We must decide whether the federal government may criminally prosecute two ministers of the Hawaii Cannabis Ministry who admit to using and distributing large quantities of cannabis, but who claim that in doing so they were merely exercising their sincerely held religious beliefs.

I

The Reverend Roger Cusick Christie founded the Hawaii Cannabis Ministry in the year 2000, in Hilo, a city on the

Island of Hawaii. Rev. Christie envisioned the Ministry as "a community wherein Cannabis could be celebrated as a sacrament." Sherryanne Christie was received into the Ministry in 2007, and in 2008 she was ordained a minister, eventually joining Rev. Christie as a sort of "assistant manager." Sherryanne ran the Ministry by herself for several months in 2009 while Rev. Christie recuperated from a broken ankle. The two wed in 2012.

## A

According to Rev. Christie, "[t]he consumption, possession, cultivation and distribution of Cannabis are essential and necessary components of the THC Ministry,"[1] which distributed cannabis both to its members and to medical marijuana users. As Rev. Christie put it, "[n]o truly religious person would turn a blind eye to those in need."

Rev. Christie boasted of winning the Ministry 2,000 to 3,000 converts on the Island of Hawaii, and another 62,000 worldwide. His charisma consisted, in part, of his promise that those who joined his flock would be delivered from the

---

[1] "THC" is presumably a (not so subtle) allusion to tetrahydrocannabinols, which are hallucinogenic substances that are found in cannabis and are specifically listed as Schedule I controlled substances under the federal Controlled Substances Act (CSA), 84 Stat. 1242, 21 U.S.C. § 801 *et seq.*, and its implementing regulations, 21 C.F.R. § 1308.11(d)(31). Following the parties' lead, we use the terms "cannabis" and "marijuana" interchangeably. Hence, references to marijuana should be understood to signify cannabis within the meaning of the CSA. *Cf.* 21 U.S.C. § 802(16) ("The term 'marihuana' means all parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin.").

reach of federal drug laws. For instance, he was enthusiastic about advertising the Ministry's slogan: "We use cannabis religiously and you can too." Similarly, the Ministry's website prominently displayed an assurance that members would know neither "arrest," nor "prosecution," nor "conviction of 'marijuana' charges . . . starting as soon as you sign up."

Signing up was not difficult. There were two primary paths to membership. Those who wished could come to downtown Hilo and meet with Rev. Christie at the Ministry's physical home, called the Sanctuary. Rev. Christie would often insist on a "donation" of fifty dollars, and while he reserved the right to turn hopefuls away, one of the Ministry's former employees could not recall anyone ever being rejected. To the contrary, Rev. Christie even boasted of enrolling people who "come in on a cruise ship and they, you know they are just here for a day and they need. . . you know?" Alternatively, one could join the Ministry by purchasing a so-called "Sanctuary Kit" for $250 through the Ministry's website. Sanctuary Kits included one or two blank membership cards; information about the Ministry, and about laws governing religious cannabis use; and various cannabis-related items (but no cannabis itself). The Ministry's website made clear that there was no minimum age to join, and that even minors could become members.

The Ministry obtained its cannabis from various sources, including from a black market in and around Hilo, and distributed cannabis in two primary ways.

First was during "communion" at Sunday services, which took place every week for approximately two hours at a time. At the start of each service Rev. Christie would ask those

present to introduce themselves and explain why they had come, in order, he testified, to "weed out" (his pun) "any visitors or members who seemed insincere." There is no evidence of how he went about doing so.

Second, during the week Rev. Christie and other Ministry employees would distribute cannabis to members who came in person to the Sanctuary, again in exchange for a suggested donation price. As Rev. Christie explained, members could choose from a broad menu of cannabis products to pick up and to take away with them: "packets," "live plants," "clones," "seeds," "candy," "brownies and chocolate chip cookies all with cannabis," "holy anointing oil," and "tinctures."[2]

The Ministry's distribution protocol required those who wished to obtain cannabis during the week to appear in person and to present a membership card or a state-issued medical marijuana card. Prior to the Spring of 2009, recipients were also required to meet privately with Rev. Christie. By April 2009, the Ministry was distributing more than half a pound of cannabis among approximately sixty to seventy people daily, "most everyday."

It was around this time that the Christies instituted a more efficient distribution method, dubbed the "express" procedure. Its purpose was to allow individuals to receive cannabis from the Ministry without first having to meet

---

[2] Tinctures could be used in a variety of ways, as Rev. Christie explained to one interested party over the phone: for example, "[y]ou carry your purse, you can dose yourself [at] the movie theater[,] at the restaurant. . . . You just take out the bottle and give a drop in your tongue and away you go, nobody even looks at you."

privately with either Sherryanne or Rev. Christie. Instead, each person would order a specific amount of cannabis from a Ministry staff member, hand over his or her Ministry ID card, tender the corresponding "donation" price—which could be more or less expensive depending on the quality of the herb—and wait while the staff member retrieved the requested cannabis from Rev. Christie or Sherryanne. The express procedure eventually became the "primary way" the Ministry distributed cannabis, and it was so popular that it often generated a line stretching out the Ministry door and onto the sidewalk.

The Christies were proud that the Ministry achieved such a high profile, and they aver that they operated the Ministry in an open and non-secretive manner throughout its history. Rev. Christie was something of a public personality, for instance, speaking candidly about the Ministry's activities in various news media and even running for mayor on a ticket pushing marijuana reform. Over the years Rev. Christie also met several times to discuss the Ministry with various representatives of state and federal law enforcement.

The Christies wrote down a handful of rules nominally designed to ensure that cannabis went out only to Ministry members or medical marijuana users. But in practice these rules were little more than parchment barriers.

Specifically, the Ministry "did not confirm that persons who came to the express service were who their Ministry ID card identified them as," and the employees administering express "did not confirm that the person named on the Ministry ID card was actually a member." In addition, the district court found that Ministry employees "never advised people who came through the express service that there were

restrictions on what 'members' could do with the sacrament. For example, they never told customers that the sacrament was only for religious purposes or that 'members' could only use the sacrament on Ministry premises or that 'members' were prohibited from distributing the sacrament to non-members."

B

In response to these concerns, the federal government opened a criminal investigation into Rev. Christie and the Ministry. Investigatory results included 284 marijuana plants which law enforcement officers found in July 2009 on a farm run by friends of the Christies, whom the Christies had recruited to cultivate marijuana to be distributed through the Ministry. In June 2010, a grand jury indicted Rev. Christie, Sherryanne, and various of their associates, charging them with a handful of crimes including numerous Controlled Substances Act ("CSA") violations. *See* 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), 846, and 856(a)(1). After the district court denied four of their pretrial motions, Rev. Christie and Sherryanne ultimately pled guilty pursuant to plea agreements. Rev. Christie pled guilty, as relevant here, to one count of conspiracy to manufacture and distribute 100 or more marijuana plants, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(B). For her part, Sherryanne pled guilty to one count of conspiring to manufacture and distribute fifty or more marijuana plants, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(C).

Rev. Christie was sentenced to sixty months in prison, to be followed by four years of supervised release. Sherryanne was sentenced to twenty-seven months in prison, to be followed by three years of supervised release.

The Christies timely appealed their convictions. The district court had jurisdiction under 18 U.S.C. § 3231, and we have jurisdiction under 28 U.S.C. § 1291.

II

The Christies first claim that their convictions violate their rights freely to exercise their religion, as guaranteed by the Religious Freedom Restoration Act of 1993 (RFRA), 107 Stat. 1488, 42 U.S.C. § 2000bb *et seq.*[3]

A

RFRA supplies a rule of decision in cases where a person finds himself in the unfortunate position of needing to choose between following his faith and following the law. "In general," RFRA provides, sincere religious objectors must be given a pass to defy obligations that apply to the rest of us, if refusing to exempt or to accommodate them would impose a substantial burden on their sincere exercise of religion. 42 U.S.C. 2000bb-1(a).

But this rule is not absolute. "The mere fact that [a person's] religious practice is [substantially] burdened by a

---

[3] The Christies do not argue that the government has violated their rights under the First Amendment's Free Exercise Clause, presumably recognizing that any such theory would be doomed by the Supreme Court's decision in *Employment Division v. Smith*, which held "that the right of free exercise [under the First Amendment] does not relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes . . . conduct that his religion prescribes." 494 U.S. 872, 879 (1990) (quoting *United States v. Lee*, 455 U.S. 252, 263 n.3 (1982) (Stevens, J., concurring in the judgment)).

governmental program does not mean that an exemption accommodating his practice must be granted." *Thomas v. Review Bd.*, 450 U.S. 707, 718 (1981).  Even in the circumstances just described, RFRA allows the federal government to treat religious objectors the same as everyone else "only if" the government meets a two-part test: the government must demonstrate that forcing the religious objector to comply with the law is both "in furtherance of a compelling governmental interest," and is "the least restrictive means of furthering that compelling governmental interest."  42 U.S.C. § 2000bb-1(b).  If the government cannot justify its actions under that test, courts are directed to order "appropriate relief" against the government and in favor of the religious objector.  *Id.* § 2000bb-1(c).

In other words, RFRA gives each person a statutory right not to have his sincere religious exercise substantially burdened by the government, save for cases expressly denominated "[e]xception[al]." *Id.* § 2000bb-1(b). Moreover, RFRA is explicit that such right may be invoked against the government as either a "claim or defense," *id.* § 2000bb-1(c), a sword or a shield.  If a person has a sufficiently realistic fear that the government is going to punish him for exercising his religious beliefs in defiance of the law, he may unsheathe RFRA and file a preemptive strike in an effort to subdue the government before it treads further. *E.g.*, *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 425–27, 439 (2006) (granting a preliminary injunction under RFRA to a religious sect threatened with prosecution for past violations of the CSA); *Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751, 2785 (2014) (enjoining government from requiring full compliance with the Affordable Care Act of claimants who felt compelled to violate its commands for religious reasons).  Alternatively,

if the government strikes first—for example, by indicting a person for engaging in activities that form a part of his religious exercise but are prohibited by law—the person may raise RFRA as a shield in the hopes of beating back the government's charge. *E.g.*, *United States v. Bauer*, 84 F.3d 1549, 1559 (9th Cir. 1996) (vacating convictions so defendants could interpose RFRA as defense to having possessed marijuana in violation of the CSA); *see also Wisconsin v. Yoder*, 406 U.S. 205, 207, 234–35 (1972) (striking down criminal convictions and nullifying state compulsory school-attendance law as applied to religious objectors who invoked First Amendment defense to prosecution). In either scenario, a religious objection may have the effect of immunizing the objector's past conduct from official sanction—even though such conduct violated a law that is otherwise valid—and of nullifying, in whole or in part, his continuing duty to comply with a generally applicable command.

B

For their RFRA defense to prevail, the Christies first had to establish a prima facie case. *United States v. Zimmerman*, 514 F.3d 851, 853 (9th Cir. 2007) (per curiam). The Christies were required to demonstrate that the beliefs they espouse are actually religious in nature (rather than philosophical or political, for example); that they sincerely hold those beliefs, and do not simply recite them for the purpose of draping religious garb over commercial activity or straightforward drug trafficking; and that forcing them to obey the federal marijuana laws would impose a substantial burden on their ability to conduct themselves in accordance with those sincerely held religious beliefs.

The district court assumed without deciding that the Christies had satisfied all of those elements. A fairminded observer might question just how plausible each of those assumptions really is, but on this appeal we are not asked to determine if any of them would stand up under scrutiny. Like the district court, we will assume—without deciding, and for purposes of this proceeding only—that the Christies have successfully established a prima facie case under RFRA.

With that assumption, RFRA forbids the government from requiring the Christies to comply with the CSA unless the government can make two showings. The government must demonstrate, first, that demanding the Christies' unbending compliance—more concretely, forcing the Christies to violate their religious beliefs by ceasing to use and to distribute cannabis altogether—would actually advance a compelling government interest to some meaningful degree. *See Hobby Lobby*, 134 S. Ct. at 2779 (holding that government must demonstrate that its "marginal interest in enforcing the [challenged law] *in these cases*" is compelling (emphasis added)); *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 803 n.9 (2011) ("[T]he government does not have a compelling interest in each marginal percentage point by which its goals are advanced."). If the government clears that hurdle, it must then show that forcing the Christies to comply with the CSA is the least restrictive means by which it can achieve its compelling interest. That is, the government must show that it would not be able to "accommodate [the Christies'] religion more without serving [its compelling] interest less." *United States v. Friday*, 525 F.3d 938, 946 (10th Cir. 2008).

The district court concluded that the government had done everything RFRA requires. We review the district court's

compelling-interest and least-restrictive-means conclusions de novo, *United States v. Vasquez-Ramos*, 531 F.3d 987, 990 (9th Cir. 2008) (per curiam), but we review any findings of "historical fact" underlying those conclusions for clear error, *see Ornelas v. United States*, 517 U.S. 690, 699 (1996).

## C

The threshold question is whether the government has a compelling interest in prosecuting the Christies for using and distributing cannabis. As the Supreme Court has emphasized, "RFRA requires the Government to demonstrate that the compelling interest test is satisfied through application of the challenged law 'to the person'—the particular claimant whose sincere exercise of religion is being substantially burdened." *O Centro*, 546 U.S. at 430–31 (quoting 42 U.S.C. § 2000bb-1(b)). Hence, we must "look[] beyond broadly formulated interests justifying the general applicability of government mandates and scrutinize[] the asserted harm of granting specific exemptions to particular religious claimants." *Id.* at 431. The compelling-interest determination "is not to be made in the abstract," but "*in the circumstances of this case*." *Cal. Democratic Party v. Jones*, 530 U.S. 567, 584 (2000).

### 1

The government first argues that it has a compelling interest in mitigating the risk that cannabis from the Ministry will be diverted to recreational users, and that the facts of this case demonstrate that mandating the Christies' full compliance with the CSA would help to advance this compelling interest to a meaningful degree. We agree.

We have little trouble concluding that the government has a compelling interest in preventing drugs set aside for sacramental use from being diverted to non-religious, recreational users. A risk of "diversion," after all, simply means the threat that cannabis—an illegal, Schedule I controlled substance—will wind up in the hands of people whose use is disconnected from any sincere religious practice. Such illegal, non-religious use, by definition, finds no protection under RFRA. Further, the government's interest in reducing the incidence of illicit, recreational cannabis use follows from its more general interest in enforcing the CSA to "promot[e] public health and safety," an interest the Supreme Court recognized in *O Centro*. 546 U.S. at 438. Moreover, insofar as diverted cannabis could foreseeably fall into the hands of minors, or otherwise expose them to the hazards associated with illegal, recreational drug use, the government's interest in reducing the likelihood of diversion is contained within its "compelling interest in protecting the physical and psychological well-being of minors." *Sable Commc'ns of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 126 (1989).

In addition to demonstrating that it has a compelling interest in combating the risk of diversion in general, the government must take a second step under RFRA: it must show that its interest in combating diversion is compelling on the facts of this case. *Cf. Entm't Merchs.*, 564 U.S. at 799 (explaining that the government "must specifically identify an actual problem in need of solving," and must show that the burden on the specific claimants' religious exercise is "actually necessary to the solution." (quotation marks omitted)). *O Centro* is instructive. There, the Supreme Court endorsed the government's "general interest in promoting public health and safety by enforcing the Controlled

Substances Act," 546 U.S. at 438, although it held that under RFRA such a general interest is not compelling unless the government submits additional proof that the specific RFRA claimants' particular activities create a risk of diversion to non-members or a risk to the health of the religious practitioners, *id.* at 437.

The record in this case succeeds where the record in *O Centro* fell short because, as the district court concluded, in this case there is specific evidence that the Ministry's distribution methods created a realistic possibility that cannabis intended for members of the Ministry would be distributed instead to outsiders who were merely feigning membership in the Ministry and adherence to its religious tenets. Additionally, the government's interest in this case is all the more compelling given the Ministry's well-publicized willingness to extend membership in the Ministry (with all that that entails) to minors.

For those reasons, we agree with the government that mandating the Christies' compliance with the CSA would help it advance a compelling interest in preventing diversion. If the government took no action against the Christies, its compelling interest would be meaningfully compromised.

2

The Christies make three counterarguments, none of which we find persuasive. First, they argue that the magnitude of any diversion risk was insubstantial, because (i) the Ministry's distribution was governed by formal rules limiting recipients to sincere members and medical marijuana patients; and (ii) the government failed to produce any actual evidence that the Ministry's cannabis had been diverted to

non-adherents in the past.  We reject the first point because, as discussed above, there is more than enough evidence in the record to support the district court's conclusion that the Ministry's broad and loose distribution methods gave rise to a realistic threat of diversion, notwithstanding whatever rules were technically on the books.  We reject the second point as well because we see no reason the government should be required to demonstrate past incidents of diversion in order to establish a compelling interest in combating a realistic *risk* that diversion will occur in the future.  Indeed, in *O Centro*, "the absence of any diversion problem in the past" was not enough to defeat the government's effort to establish a compelling interest in preventing diversion going forward. *See O Centro*, 546 U.S. at 426.  Furthermore, unlike in *O Centro*, here the record establishes the existence of a black market for cannabis in and around Hilo, as well as the opportunity for diversion from the Ministry created by lax enforcement of its distribution protocols.  These circumstances remove any doubt that the Ministry's cannabis was "vulnerable to diversion."   *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 282 F. Supp. 2d 1236, 1262 (D. N.M. 2002).

Second, the Christies criticize the district court's determination that weaknesses in the Ministry's distribution procedures created a clear potential for diversion.  The Christies contend that the analysis and factual findings underlying the district court's conclusion are flawed, for a variety of reasons.  Even if some of these arguments are debatable, they are simply too weak to survive under our deferential "clearly erroneous" standard of review.  "To be clearly erroneous, 'a finding must be more than possibly or even probably wrong; the error must be pellucid to any objective observer.'" *United States v. Quaintance*, 608 F.3d

717, 721 (10th Cir. 2010) (quoting *Watson v. United States*, 485 F.3d 1100, 1108 (10th Cir. 2007)). None of the conclusions the Christies attack is clearly erroneous.

Third, the Christies contend that the government simply has no compelling interest in preventing the diversion of cannabis, period. They offer three main reasons: current medical and scientific evidence proves that the CSA's classification of marijuana as a Schedule I controlled substance lacks a rational basis; the CSA grants an exemption for the Native American Church's use of peyote, and other groups have been granted exemptions to use *hoasca*—and taken together, the argument goes, these precedents discredit the government's asserted interest in preventing diversion of the Ministry's cannabis; and the Department of Justice has, of late, instituted policy exceptions to its enforcement of the CSA's marijuana provisions.[4] We reject these arguments.

---

[4] The Christies cite an August 29, 2013 memo from then-Deputy Attorney General James M. Cole to "all United States Attorneys." The memo, entitled "Guidance Regarding Marijuana Enforcement," updates federal prosecutors on DOJ's strategy for enforcing the CSA "in light of state ballot initiatives that legalize under state law the possession of small amounts of marijuana and provide for the regulation of marijuana production, processing, and sale." Indeed, at least two states in this Circuit—Washington beginning in 2012, and Oregon in 2015—have authorized the possession and retail sale of marijuana (subject to state fees and taxes) under conditions which seem to cast state law at cross-purposes with federal criminal enforcement. *See* Wash. Rev. Code Ann. §§ 69.50.4013(3), 69.50.382, 69.50.385, 69.50.535 (West); *see generally State v. Rose*, 365 P.3d 756 (Wash. Ct. App. 2015); Or. Rev. Stat. Ann. §§ 475.864, 475B.110, 475B.345 (West); *see generally State v. Mays, Jr.*, 346 P.3d 535 (Or. Ct. App. 2015).

Despite liberalization under certain state laws, the memo affirms DOJ's "commit[ment] to enforc[ing] the CSA consistent with" Congress's judgment "that marijuana is a dangerous drug and that the illegal

a

In the first place, the Christies have not come close to showing that the CSA's classification of marijuana as a Schedule I controlled substance lacks a rational basis and therefore violates the Fifth Amendment. We discuss this contention of theirs in greater depth later in this opinion. *See* Part IV, *infra*.

b

Nor are the Christies aided by exemptions that different groups have won for the sacramental use of peyote and *hoasca*. The Christies are right that RFRA does not allow the government to refuse an accommodation to a group which is materially indistinguishable from one already exempted, but the government has not violated that principle in this case.

---

distribution and sale of marijuana is a serious crime that provides a significant source of revenue to large-scale criminal enterprises, gangs, and cartels." Nevertheless, the memo clarifies that DOJ intends to "focus[] its efforts on certain enforcement priorities that are particularly important to the federal government." The listed priorities include "[p]reventing the diversion of marijuana from states where it is legal under state law in some form to other states" and "[p]reventing the distribution of marijuana to minors," especially "when marijuana or marijuana-infused products are marketed in a manner to appeal to minors; or when marijuana is being diverted, directly or indirectly, and purposefully or otherwise, to minors."

The memo stresses that it "is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, enforceable at law by any party in any matter civil or criminal," and that "nothing herein precludes investigation or prosecution, even in the absence of any one of the factors listed above, in particular circumstances where investigation and prosecution otherwise serves an important federal interest."

Indeed, the peyote and *hoasca* precedents say very little about whether the government has a compelling interest in preventing diversion of the Ministry's cannabis. As courts have repeatedly emphasized, cannabis differs critically from peyote and *hoasca* precisely because there is a thriving market for diverted cannabis, whereas there is no comparable demand for recreational peyote and *hoasca*. *See, e.g.*, *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1020 (10th Cir. 2004) (en banc) (McConnell, J., concurring); *Olsen v. Drug Enf't Admin.*, 878 F.2d 1458, 1463–64 (D.C. Cir. 1989); *Church of the Holy Light of the Queen v. Mukasey*, 615 F. Supp. 2d 1210, 1220–21 (D. Or. 2009), *vacated on other grounds sub nom. Church of the Holy Light of the Queen v. Holder*, 443 Fed. App'x 302 (9th Cir. 2011); *United States v. Lepp*, 2008 WL 3843283, at \*11 (N.D. Cal. Aug. 14, 2008).

The record here shows that such a market exists in and around Hilo. And again, diversion concerns are more pressing here than in other cases due to the Ministry's well-documented lack of diligence in overseeing its distribution methods. In short, it follows from the "focused inquiry" demanded by RFRA, *O Centro*, 546 U.S. at 432, that even if the government lacks a compelling interest in preventing diversion of one particular drug from one particular religious group, the government may still have a compelling interest in preventing diversion of a different drug from a different religious group. That is exactly the case here.

c

Finally, recent shifts in DOJ enforcement priorities do not deprive the government of a compelling interest in preventing diversion of the Ministry's cannabis. We are of course

mindful of the Supreme Court's admonition that "a law cannot be regarded as protecting an interest of the highest order when it leaves appreciable damage to that supposedly vital interest unprohibited." *O Centro*, 546 U.S. at 433 (quoting *Church of Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 547 (1993)) (alteration omitted).

Nevertheless, the recently promulgated DOJ memos touted by the Christies do not establish that the government's enforcement efforts have been so completely abandoned, or are so thoroughly honeycombed with exemptions, for us to conclude that the government has forfeited any claim to a compelling interest in preventing mass diversion of cannabis. By their own terms, the memos are "intended solely as a guide to the exercise of investigative and prosecutorial discretion," and "do[] not alter in any way the Department's authority to enforce federal law, including federal laws relating to marijuana, regardless of state law." Like proposed administrative rules, DOJ memos ought not be given great weight because they do not announce "final decision[s]," and the DOJ "may well revise its analysis" in light of new information or changed circumstances. *United States v. Antoine*, 318 F.3d 919, 921 (9th Cir. 2003). Indeed, the DOJ may alter its approach based simply on the election of a new administration with different priorities and a different philosophy. *Cf. Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part and dissenting in part). Hence, while perhaps relevant, DOJ policies do not carry the weight the Christies ascribe to them. It is not for us to decide whether prosecuting the Christies represents the best exercise of prosecutorial discretion, or the wisest allocation of the Executive's finite resources.

In sum, we conclude that the government has a compelling interest in preventing diversion of the Ministry's cannabis, and that enforcing the CSA against the Christies would meaningfully advance that interest.

3

Separate and apart from its interest in preventing diversion of the Ministry's cannabis, the government urges that it has a compelling interest in "preserving [its] ability to administer" the CSA. Specifically, the government argues that granting the Christies an exception would compromise its ability to enforce the CSA because it would spawn a multitude of RFRA claims, likely for "the distribution of other drugs in high demand, perhaps cocaine or heroin." The government also asserts that the CSA, like the tax code, is a closed regulatory system that could not function if it were subject to religious carve-outs.

We are unpersuaded by these arguments, for each of them was squarely rejected by the Supreme Court in *O Centro*. The government may well be right that granting an exception to the Christies would invite a flood of RFRA claims, perhaps for distribution of cocaine and heroin. But that objection is insufficient, for it is nothing more than a "slippery-slope concern[] that could be invoked in response to any RFRA claim." *O Centro*, 546 U.S. at 435–36. Furthermore, *O Centro* specifically held that the CSA is *not* like the tax code or other "closed regulatory system[s] that admit[] of no exceptions under RFRA." *Id.* at 434. Like it or not, when religious objectors raise RFRA as a defense to prosecution under the CSA, RFRA requires courts to "strike sensible balances" on a case-by-case basis, in light of "the particular practice at issue." *Id.* at 439.

## D

While we agree with the government that forcing the Christies to obey the CSA's no-cannabis-distribution mandate would advance a compelling interest in mitigating a realistic threat of diversion, we must still ask whether the government has chosen the least restrictive means necessary to achieve that interest.

As its name implies, the "least restrictive means" test calls for a comparative analysis. In one corner we have the government's preferred means: a mandate that the Christies comply with the CSA to the letter, enforceable with criminal penalties. Our job is to lay such preferred means side by side with other potential options. Could the government achieve its compelling interest to the same degree while exempting the Christies from complying in full with the CSA? That is the question RFRA requires us to confront. And the government must demonstrate, based on the facts before us, that the answer is "no."

At a minimum, the government must address those alternatives of which it has become aware during the course of this litigation. *United States v. Wilgus*, 638 F.3d 1274, 1289 (10th Cir. 2011) ("[T]he government's burden is two-fold: it must support its choice of regulation, and it must refute the alternative schemes offered by the challenger, but it must do both through the evidence presented in the record."); *see also Zubik v. Burwell*, 136 S. Ct. 1557, 1560 (2016) (vacating and remanding cases to lower courts for fresh RFRA analysis "[i]n light of the positions asserted by the parties in their supplemental briefs"). The government must show that each proposed alternative either is not "le[ss] restrictive" within the meaning of RFRA, *see* 42 U.S.C.

§ 2000bb-1(b)(2), or is not plausibly capable of allowing the government to achieve all of its compelling interests.

In this case, the Christies have put forth four purportedly less restrictive alternatives.

1

The Christies first emphasize that "[n]umerous statutory, judicially-crafted, and policy exceptions exist to the CSA," again citing the Native American Church and its exemption for peyote use. The Christies take this to prove that the government need not mandate their unbending compliance with the CSA in order to achieve its compelling interest in preventing diversion.

We have already explained why this argument fails. The Christies cannot simply point to other groups who have won accommodations for the sacramental use of peyote and *hoasca* and say "we'll have what they're having," because the government has shown material differences between those particular groups and their sacramental practices, on the one hand, and the Christies and their religious exercise, on the other.

2

The Christies next assert that a less restrictive alternative would have been for the government to bring these prosecutions under a less punitive provision of the CSA, ideally a provision that would not have triggered statutory mandatory minimum penalties. The Christies cite nothing for the proposition that a (potentially) less punitive charging decision qualifies as a "less restrictive" alternative.

We find such lack of authority unsurprising, for at least two reasons. First, when the government exposed the Christies to the threat of a mandatory minimum, it did not restrict their religion to a greater degree than if the government had forgone such charges, for either prosecution would trigger an outright ban on their ability to use and to distribute cannabis. Such alternative prosecutions are equally *restrictive of religion*, even if they might not be equally *punitive*. *Cf. Hobby Lobby*, 134 S. Ct. at 2782 n.40 (explaining that to qualify as a less restrictive means, a proposed alternative must "accommodate[] the religious beliefs asserted in these cases"). Second, given the broad array of charges prosecutors can choose to bring or not to bring in any given case, recognizing the Christies' theory would plunge courts far too deep into the business of reviewing the most basic exercises of prosecutorial discretion.

3

The Christies next contend that the government should have given them "notice" of its "compelling interest prior to the imposition of criminal penalties." We understand the Christies to mean that RFRA blocks the government from prosecuting them now because it failed to alert them to its ongoing investigation before it indicted them. That view is wrong.

The CSA itself gave the Christies all the notice to which they were entitled; no authority we have encountered suggests that RFRA obligates the government to tip off parties who are about to be indicted and might raise a RFRA defense. Such outreach might be good practice—at least in those cases where the government is aware of the possibly religious

nature of the offensive conduct—but we cannot say that RFRA compels it.    Nor does RFRA suggest that the government is somehow estopped from prosecuting a particular defendant who engages in religiously motivated but otherwise unlawful conduct, simply because the government has failed to prosecute such person for some period of time previously (whether through inadvertence, temporary enforcement discretion, or simply because it was awaiting the fruits of a pending investigation).

4

Finally, the Christies suggest meeting the government somewhere in the middle.    Rather than complying with the CSA's total prohibition on using and distributing cannabis, the Christies propose that they would shut down the express distribution method, if they were permitted to continue using and distributing cannabis in the allegedly more circumscribed manner they had employed previously.    Such compromise, they insist, represents a plausible means by which the government could achieve its compelling interests.

The government has convinced us otherwise, and therefore we decline to grant the Christies' requested relief. Indeed, the Supreme Court vindicated free exercise claims in cases like *Yoder*, *O Centro*, and *Hobby Lobby* only because it was convinced that, on the facts before it, the government could very likely achieve all of its compelling interests without insisting that the religious objectors comply with the relevant laws in full.    That determination is necessarily fact-specific and context-dependent.    But RFRA requires nothing less.    As *O Centro* emphasized, "'[c]ontext matters'" when applying RFRA, for the standard it employs—strict scrutiny—"*does* take 'relevant differences' into account—

indeed, that is its fundamental purpose." *O Centro*, 546 U.S. at 431–32 (quoting *Grutter v. Bollinger*, 539 U.S. 306, 327 (2003), and *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 228 (1995)).

Here, given the facts of this case, it is simply not plausible to suppose that the government could achieve its compelling interest in preventing diversion if it were to accommodate the Christies in the way they have proposed. As we detailed earlier, the government has brought forth substantial evidence that the Christies distributed cannabis for years in a loose and barely discriminate manner, even before the advent of express. The problem is not simply that the Christies hardly regulated who could join the Ministry, or even that they actively marketed their church as a safe haven from the federal drug laws. More troubling is that even the barebones membership requirement was not enforced as a meaningful check on who could receive the Ministry's cannabis. Cannabis distributed through the Ministry seemed available to anyone to use anywhere; the Christies simply gave cannabis to those who showed up, took their money, and sent them on their way. In view of these circumstances, and given the Christies' steadfast belief in a divine command to spread cannabis far and wide—to "liberat[e] cannabis" and to "cultivate . . . and distribute herb all over the world," as Rev. Christie described his vocation—we are incredulous that the Christies would undertake the sort of extensive reforms needed to mitigate the enormous potential for diversion the government has documented.

The Ministry's precepts and longstanding patterns of practice give us the same concerns then-Judge Ginsburg voiced in 1989 when she was confronted with a similar free exercise claim put forth by the Ethiopian Zion Coptic Church,

a group which, like the Ministry, faced prosecution under the CSA for having used and distributed cannabis in accordance with their religious beliefs. *See Olsen*, 878 F.2d at 1459. Like the Christies, members of the Church sought an accommodation premised on a "proposal for restrictive use." *Id.* at 1462. The D.C. Circuit rejected their proposed less restrictive alternative. It concluded that the Church's "proposal for confined use would not be self-enforcing," given that "the tenets" of the Church endorsed broad and continual cannabis use, and because the record demonstrated that the Church had previously enforced only "'minimal'" checks on "'distribution of cannabis to nonbelievers.'" *Id.* (quoting *Town v. State ex rel. Reno*, 377 So. 2d 648, 649 (Fla. 1979)). Although *Olsen* was a pre-RFRA case, we find its reasoning instructive as applied to the Christies. Given the record here, we are left with the conclusion that requiring the Christies to comply with the CSA's no-cannabis-distribution mandate is the least restrictive means by which the government can achieve its compelling interest in preventing diversion, and we therefore refuse to order dismissal of the Christies' indictments on RFRA grounds.

RFRA sets a demanding test: it obligates the government to satisfy the compelling-interest and least-restrictive-means tests with respect to "the person" whose religious exercise is substantially burdened in a specific case. 42 U.S.C. § 2000bb-1(b). This focused inquiry requires that we not ease the government's burden by rubberstamping vague or generalized arguments about means and ends; but, just as much, it means that we may not blind ourselves to who "the person" seeking a religious exemption actually is in a given case. And in this case, in light of these defendants and the facts in this record, we are convinced that the government could not achieve its compelling interest in mitigating

diversion through anything less than mandating the Christies' full compliance with the Controlled Substances Act.

The Christies' statutory free exercise rights have not been violated. We reject their RFRA defense.

E

Finally, before moving on from RFRA, we must address an additional argument put forth by Sherryanne Christie, who maintains that she should be exempted from prosecution, even if her husband is not, because he was the founder and leader of the Ministry, while she was a mere underling who joined in reliance on his word that RFRA would shield them from prosecution.

We reject this claim. There is no justification for treating Sherryanne differently from her husband. Sherryanne was a leader in the Ministry—even if she was her husband's subordinate—and her zeal for distributing cannabis was no less ardent than her husband's.

Moreover, even if we were sympathetic to Sherryanne's self-serving portrait of her role in the Ministry, we would reject her theory because it misunderstands the nature of a RFRA claim. Sherryanne's argument amounts to a promise that if spared prosecution, she will refrain from using and distributing cannabis altogether. Sherryanne, in other words, is not really asking for a religious accommodation at all. *Cf. E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 135 S. Ct. 2028, 2032 n.2 (2015) ("[T]o 'accommodate' . . . means nothing more than allowing the plaintiff to engage in her religious practice despite the . . . normal rules to the contrary . . . ."). Hence, Sherryanne's proposed alternative is no less

restrictive than what the government seeks here: full compliance with the CSA.

RFRA empowers courts to grant exceptions to generally applicable laws so that otherwise-unlawful conduct may be permitted to continue. RFRA does not, however, contemplate that courts will direct the Executive to dismiss a prosecution whenever a defendant volunteers to abandon all of the religious conduct he or she had pursued in the past. If Sherryanne has undergone a conversion in response to being indicted, that is something the prosecution might like to have known, but it will not entitle her to the saving grace of a RFRA defense.

## III

The Christies next contend that their indictments must be thrown out on the theory that RFRA is unconstitutionally vague, and thereby renders the CSA unconstitutionally vague. We review this argument de novo. *United States v. Woodley*, 9 F.3d 774, 778 (9th Cir. 1993).

The Christies contend that RFRA plunges courts so deep into a morass of free-form balancing that the statute is unconstitutionally vague. And the remedy, they go on, is to dismiss their indictments. Notably, the Christies do not allege that the CSA is in any sense vague, or that they lacked notice that their cannabis activities fell within its terms. Nor could they. Instead, their basic argument is that RFRA amends the CSA; RFRA's balancing tests are hopelessly open-ended; therefore, they could not predict in advance whether RFRA would immunize their otherwise-criminal conduct. RFRA's intersection with the CSA, they conclude, violates the Fifth Amendment's prohibition on vague criminal

laws. For the same reasons, the Christies also seek refuge under the rule of lenity.

We are not persuaded. Indeed, the Fifth Amendment simply has no application here. RFRA cannot be unconstitutionally vague because it is not a penal statute or anything like one.[5] It does not define the elements of an offense, fix any mandatory penalty, or threaten people with punishment if they violate its terms. Rather, it supplies religious objectors like the Christies with an affirmative defense to criminal prosecution. 42 U.S.C. § 2000bb-1(c). The Christies cite no authority for the proposition that the Fifth Amendment can be used to invalidate a prosecution under a clear criminal law, simply because that law is subject to an affirmative defense that is "vague." (That is, vague in the sense the Christies claim RFRA is vague—that a person may have a hard time predicting in advance whether the defense will immunize him or her from liability.) And for good reason: one could level the same charge against many affirmative defenses, including self defense, necessity, or defense of another (to say nothing of duress, entrapment, and insanity). Because such affirmative defenses are widely

---

[5] Justice Thomas, in his history of the void-for-vagueness doctrine, cites one case in which the Supreme Court voided a vague statute that he classifies as non-penal. *Johnson v. United States*, 135 S. Ct. 2551, 2566 n.1 (2015) (Thomas, J., concurring in the judgment) (citing *Keyishian v. Bd. of Regents*, 385 U.S. 589 (1967)). But, significantly, the statute in *Keyishian* required termination of public employment for "treasonable or seditious" utterances or acts. 385 U.S. at 597. Hence, even if it was technically not penal, it was closely analogous. Moreover, it raised due process concerns just like an ordinary penal law, because, as the Supreme Court has held elsewhere, public employment can qualify as a constitutionally protected property interest. *Perry v. Sindermann*, 408 U.S. 593, 601–03 (1972).

applicable under federal and state law, the Christies' theory has the potential to render many sections of the criminal code void for vagueness. That is good evidence that their theory is unsound.[6]

The Christies' appeal to the rule of lenity is equally untenable. Once again they cite no authority for the position that lenity applies to "ambiguous" affirmative defenses rather than to ambiguous laws that define elements or mandate punishment. Moreover, any defendant invoking RFRA could make the same lenity argument the Christies press here; hence, like their vagueness argument, their lenity argument risks invalidating every prosecution where a defendant seeks protection under RFRA. For good reason, that cannot be right.

IV

The Christies next contend that their indictments should be dismissed on the theory that the CSA's classification of

---

[6] Even if the Christies were correct that the void-for-vagueness doctrine applies and that RFRA is unconstitutionally vague, they never explain why the proper remedy would be to dismiss their indictments, instead of striking down RFRA and tossing their defenses along with it. And even if the Fifth Amendment *did* require us to enjoin the present prosecutions, the implication would be that *every* federal prosecution is at risk of being enjoined, because—as the Christies emphasize—RFRA amends the entire United States Code. 42 U.S.C. § 2000bb-3(a). A theory that renders every federal criminal law potentially void for vagueness cannot be right. Further, if RFRA's test makes the CSA unconstitutionally vague, then the CSA must have been unconstitutionally vague when it was subject to an identical free exercise defense under the balancing tests set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963) and *Yoder*, 406 U.S. 205 in the days prior to *Smith*, 494 U.S. 872. *See* 42 U.S.C. § 2000bb. That clearly cannot be right.

marijuana as a Schedule I controlled substance violates the Due Process Clause of the Fifth Amendment. We review this question de novo. *Bateson v. Geisse*, 857 F.2d 1300, 1303 (9th Cir. 1988).

The Christies do not claim that the CSA's classification of marijuana infringes any of their fundamental rights. Instead, they maintain that such classification "is arbitrary and lacking in any rational justification and therefore constitutionally invalid."

This argument is foreclosed by our precedents. In 1978 we rejected a challenge identical to the one the Christies raise today. *United States v. Miroyan*, 577 F.2d 489, 495 (9th Cir. 1978), *partially overruled on other grounds as recognized by United States v. Pineda-Moreno*, 688 F.3d 1087, 1090–91 (9th Cir. 2012). And while it may be true that marijuana's legal status continues to evolve, as does its standing in the medical and scientific communities, those developments do not come close to demonstrating that changes since 1978 have left *Miroyan*'s "central holding obsolete." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 860 (1992). Thus, *Miroyan* controls our decision, and requires that we reject the Christies' due process argument.

V

Finally, the Christies contend that the district court should have suppressed certain wiretap evidence the federal government obtained in the course of investigating them and the Ministry, and that it should have ordered an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).

A

Wiretap authorizations are governed by the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510–2522. The government must show that every wiretap it seeks is necessary. Specifically, § 2518(1)(c) requires each wiretap application to include "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." If the affidavit complies with § 2518(1)(c), a judge may approve the wiretap if he "determines on the basis of the facts submitted by the applicant that . . . normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c).

We review de novo whether an application for a wiretap contains a full and complete statement of the facts required to show necessity under § 2518(1)(c). *United States v. Rivera*, 527 F.3d 891, 898 (9th Cir. 2008). If we conclude that it does, we then review the issuing court's decision to grant the wiretap for abuse of discretion. *Id.*

B

The government began investigating the Ministry as early as August 2007. In April 2009 it obtained authorization to tap two of Rev. Christie's phone numbers (TT1 and TT2), and in June 2009 it obtained an extension of those wiretaps and an authorization to tap Rev. Christie's cell phone (TT3).

The government, through DEA Agent Clement Sze, submitted a 90-page affidavit for TT1 and TT2, and a 135-

page affidavit for TT3.  We conclude that both affidavits demonstrated the requisite necessity.

### 1

First, the affidavits recounted the traditional investigative methods the government pursued before it applied for the wiretaps.  Between August 2007 and February 2009, the government utilized one confidential informant, who provided information about the Ministry, made a series of drug purchases from Rev. Christie, and engaged him in several recorded conversations.  In 2008, the informant introduced Rev. Christie to an undercover DEA agent, who likewise carried out recorded conversations.  Before applying for the wiretaps, the government also installed a pole camera outside the Ministry's front entrance, and conducted additional physical surveillance of the Ministry's building and those entering and exiting it.  Further, in May 2008 the government began to use a pen register for two of Rev. Christie's phone numbers.  The TT3 affidavit also disclosed that the TT1 and TT2 wiretaps had led the government to identify six of the Christies' cannabis suppliers.

### 2

Second, the affidavits explained why the above non-wiretap methods had failed to lay bare the full extent of the Christies' suspected drug trafficking operation.

With respect to physical surveillance, the affidavits noted that such surveillance is hard to perform in Hilo because it is a "very close-knit community," making it difficult for police officers to conceal their identities.  Moreover, the affidavits stated that Rev. Christie and his associates appeared to be

conscious of surveillance, and appeared to have engaged in "counter-surveillance" on several occasions. Furthermore, the affidavits claimed that physical surveillance was of limited use because the government could not determine which of the people entering and exiting the Ministry were cannabis suppliers as opposed to ordinary Ministry members. Finally, the pole camera was not able to video the Ministry's side entrance and could not capture audio. The TT3 application explained that during the time the TT1 and TT2 wiretaps were in operation, physical surveillance continued to be ineffective, partly due to changed circumstances like Rev. Christie's ankle injury that left him homebound for a period of time.

With respect to confidential informants and undercover agents, the affidavits stated that both techniques were of limited utility because Rev. Christie was reluctant to discuss his supply methods with Ministry members. The affidavits also predicted that if the informant tried to purchase large quantities of cannabis in an effort to draw out the suppliers, he would likely arouse Rev. Christie's suspicions. The affidavits concluded that recruiting additional informants would be difficult given that Hilo is a tight-knit community, and cited one example of a person who was arrested and claimed to work for Rev. Christie but refused to cooperate. Similarly, the undercover agent's role ended after Rev. Christie realized that he was not a sincere Ministry member but was actually a DEA agent.

Finally, pen registers could not bring the investigation home because they could not disclose the content of communications and, in most cases, failed to convey information about the parties to such communications.

3

Third, the affidavits ran through a list of traditional methods that had not been tried and explained why each was unlikely to succeed.

Vehicle trackers were said to be inadequate because most suppliers brought their cannabis to the Ministry, so tracking Rev. Christie's vehicle would not be effective. Moreover, as noted, the government's physical surveillance could not distinguish between suppliers and ordinary Ministry members, except for one time when the government identified a supplier carrying a marijuana plant into the Ministry, but he came and left too quickly for the government to put a tracker on his vehicle. Likewise, the TT3 application explained why vehicle trackers could not be applied to those suppliers who had been identified by the TT1 and TT2 wiretaps and prior physical surveillance, because their vehicles were parked in front of the Ministry only briefly and within view of multiple businesses. Finally, the affidavits noted that Hilo is comprised mostly of large rural areas, and for that reason vehicle trackers likely would not be able to pinpoint where marijuana was being grown even if they could be affixed to the vehicles of known suppliers.

The affidavits then explained that issuing grand jury subpoenas would be ineffective because people would likely invoke their Fifth Amendment privilege not to testify and could alert Rev. Christie to the investigation.

The affidavits likewise dismissed subpoenaing business and bank records because, it said, doing so could expose the investigation. The affidavits also stated (erroneously) that the

Ministry did not use banks because it operated on a "cash and carry" basis.

Finally, the affidavits explained that search warrants would not be effective because they probably would not identify Rev. Christie's sources, and also because executing search warrants would blow the lid off the investigation.

C

We conclude that each affidavit contains a full and complete statement of the facts in compliance with § 2518(1)(c). We have emphasized in the past that courts reviewing necessity are to "employ a 'common sense approach' to evaluate the reasonableness of the government's good faith efforts to use traditional investigative tactics or its decision to forego such tactics based on the unlikelihood of their success." *United States v. Gonzalez, Inc.*, 412 F.3d 1102, 1112 (9th Cir. 2005) (quoting *United States v. Blackmon*, 273 F.3d 1204, 1207 (9th Cir. 2001)). That being said, wiretap applications must contain more than "boilerplate conclusions that merely describe inherent limitations of normal investigative procedures." *Blackmon*, 273 F.3d at 1210. But minor deficiencies in detail will not doom an affidavit. Our reasoning in *Rivera* makes clear that we evaluate "the level of detail in the affidavit *as a whole*," rather than piecemeal. 527 F.3d at 899 (emphasis added); *see also id.* at 899–901.

Here, the affidavits' discussions of physical surveillance, vehicle trackers, pen registers, confidential informants, and undercover agents do more than enough to demonstrate the wiretaps' necessity. While those sections admittedly contain some boilerplate, each one also gives several case-specific

reasons why continued use of the technique in question would likely be ineffective without a wiretap. Moreover, given that the government investigated the Ministry for nearly two years before applying for the wiretaps, we cannot say that the government sought "to use the wiretap as the initial step" in its investigation. *Id.* at 902. The affidavits suffice to pass legal muster under the flexible, common-sense standard outlined above.

## D

As in *Rivera*, in this case the government "could probably have relied on [non-wiretap] techniques alone to successfully prosecute a few individuals." *Id.* But the government's legitimate interest extended beyond prosecuting a few individuals; it encompassed exposing the entire suspected conspiracy. *Id.* And, like the defendants in *Rivera*, the Christies "may well be correct" that the government "did not use traditional techniques as much as it could have." *Id.* at 903. Perhaps the government could have tried harder to recruit another confidential informant, for instance. But we have "repeatedly held that 'law enforcement officials need not exhaust every conceivable alternative before obtaining a wiretap.'" *Id.* (quoting *United States v. Canales Gomez*, 358 F.3d 1221, 1225–26 (9th Cir. 2004)). In the end, we are satisfied that the issuing court did not abuse its discretion in authorizing the wiretaps.

## E

Finally, the Christies contend that defects in the Sze Affidavits should have at least won them an evidentiary hearing pursuant to *Franks*, 438 U.S. 154.

To obtain a *Franks* hearing, a defendant must make "a substantial preliminary showing that a false statement was deliberately or recklessly included in an affidavit submitted in support of a wiretap order, and the false statement was material to the district court's finding of necessity." *United States v. Staves*, 383 F.3d 977, 982 (9th Cir. 2004). False statements are material "if the wiretap application purged of the false statements would not support findings of probable cause and necessity." *Id.* We review de novo the district court's denial of a *Franks* hearing, but we review for clear error the district court's underlying finding that the government did not intentionally or recklessly make false statements. *United States v. Meek*, 366 F.3d 705, 716 (9th Cir. 2004).

The Christies are not entitled to a *Franks* hearing. The district court found one false statement in the Sze Affidavits, namely, the statement that the Ministry operated on a "cash and carry basis." But the court concluded, rightly, that this error was not material. The district court found that the government had not made any other false statements, let alone knowingly or recklessly so. Nothing in the Christies' briefing before us shows that the district court's determinations were clearly erroneous.

VI

For the foregoing reasons, the judgment of the district court is

**AFFIRMED.**