**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

JESUS BARRAGAN, AKA Chito,
*Defendant-Appellant.*

No. 13-50516

D.C. No.
3:12-cr-00236-IEG-5

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

HECTOR FERNANDEZ, AKA
Evil,
*Defendant-Appellant.*

No. 13-50518

D.C. No.
3:12-cr-00236-IEG-14

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

FRANCISCO GUTIERREZ, AKA
Ammo, AKA Bullet,
*Defendant-Appellant.*

No. 13-50525

D.C. No.
3:12-cr-00236-IEG-6

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

PABLO FRANCO, AKA Casper,
AKA Dwarf,
*Defendant-Appellant.*

No. 13-50531

D.C. No.
3:12-cr-00236-IEG-3

OPINION

Appeals from the United States District Court
for the Southern District of California
Irma E. Gonzalez, Senior District Judge, Presiding

Argued and Submitted June 9, 2017
Pasadena, California

Filed September 8, 2017

Before:  Kermit V. Lipez,[*] Carlos T. Bea,
and Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Hurwitz

## SUMMARY[**]

### Criminal Law

The panel affirmed Jesus Barragan's, Pablo Franco's, Francisco Gutierrez's, and Hector Fernandez's convictions for conspiracy in violation of the Racketeering Influenced Corrupt Organizations Act; affirmed Barragan's conviction for drug crimes; affirmed Barragan's, Franco's, and Fernandez's sentences; but vacated Gutierrez's sentence and remanded for resentencing.

The panel rejected Gutierrez's arguments (1) that suppression of wiretap evidence was required because the affidavit supporting the application failed to show necessity, and (2) that a *Franks* hearing was required because the affidavit contained false information.

The panel held that the district court's failure to try Fernandez separately from his co-defendants was not manifestly prejudicial to him.

---

[*] The Honorable Kermit V. Lipez, United States Circuit Judge for the First Circuit, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

The panel held that the district court did not abuse its discretion in allowing a former Mexican Mafia member to testify on direct examination about his past crimes, nor in finding that the probative value of the evidence was not substantially outweighed by any prejudice. The panel found no error arising from the prosecutor's blaming, in rebuttal, the defense for bringing up the former Mafia member's violent past.

The panel held that the district court did not abuse its discretion in admitting as lay opinion case agents' testimony about the meaning of code words used by the conspirators.

The panel held that the district court did not abuse its discretion in admitting tapes of conversations between a confidential informant and alleged conspirators. The panel explained that the informant's statements on the tapes, which were offered only for context and not for their truth, were not hearsay, and their admission did not offend the Confrontation Clause.

The panel held that the government presented sufficient evidence of Fernandez's participation in the RICO conspiracy to sustain his conviction.

The panel held that the prosecutor's remarks in closing argument, emphasizing the violent nature of the defendants' crimes and repeatedly urging the jury to say "no more," were improper because they invited the jury to convict for a non-evidentiary reason: to protect the community against future violence. The panel concluded, however, that the remarks did not have a probable effect on the jury's verdict in light of the entire record.

The panel held that the district court did not abuse its discretion in refusing to give Fernandez's requested jury instructions (1) that he could not be convicted of conspiring with a government informant; (2) that his mere purchase of drugs did not establish participation in a conspiracy; and (3) that the government prove he was not a victim of extortion. The panel found no plain error in the district court's failure to give jurors an explanation for their anonymity.

Affirming Barragan's sentence, the panel held (1) that a conviction under Calif. Penal Code § 211—which necessarily involves either generic robbery or generic extortion—was categorically a "crime of violence" for purpose of the career offender guideline in effect at the time of his sentencing; and (2) that, after reviewing the judicially noticeable records of Barragan's prior conviction under California Health and Safety Code § 11379, a divisible statute, the district court properly concluded that the conviction was for selling a controlled substance offense under the career offender guideline.

The government conceded that the district court erred in calculating Gutierrez's sentence as a career offender because his conviction in this case was not for a crime of violence or a controlled substance. The panel agreed, vacating Gutierrez's sentence and remanding for resentencing on an open record.

The panel held that in finding certain RICO conspiracy predicate acts attributable to each defendant pursuant to U.S.S.G. § 2E1.1, the district court (1) was permitted to attribute to a defendant predicate acts that the jury verdicts did not so attribute and/or of which a defendant was acquitted or not formally charged; and (2) was permitted to

find facts relating to the extent of the conspiracy by a preponderance of the evidence.

## COUNSEL

John C. Lemon (argued), San Diego, California, for Defendant-Appellant Jesus Barragan.

Knut S. Johnson (argued) and Emerson Wheat, San Diego, California, for Defendant-Appellant Hector Fernandez.

Sanjay Sobti (argued), U.S. Law Center, Corona, California, for Defendant-Appellant Francisco Gutierrez.

Gary P. Gurcham, Burcham & Zugman, San Diego, California, for Defendant-Appellant Pablo Franco.

Helen H. Hong (argued), Assistant United States Attorney, Chief, Appellate Section, Criminal Division, United States Attorney's Office, San Diego, California, for Plaintiff-Appellee.

## OPINION

HURWITZ, Circuit Judge:

Jesus Barragan, Pablo Franco, Francisco Gutierrez, and Hector Fernandez were convicted of conspiracy in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"); Barragan was also convicted of drug crimes. They appeal their convictions and sentences. Although we find a portion of the prosecutor's closing argument improper, we conclude that prejudice has not been shown

and affirm the convictions.   We affirm the sentences of Barragan, Franco, and Fernandez, but vacate Gutierrez's sentence and remand for resentencing.

## I.  BACKGROUND

### A.  Investigation and Indictment

In 2010, a joint federal and state task force undertook an investigation of extortion and drug trafficking by the Mexican Mafia ("Mafia")[1] and local street gangs in San Diego County.   In January 2012, an indictment was filed charging forty alleged Mafia members and associates with engaging in an racketeering conspiracy in violation of RICO, 18 U.S.C. § 1962(d).

The indictment alleged that the Mafia imposed a "tax" on Southern California gangs in return for allowing them to sell drugs and conduct other illegal activities.   If a gang failed to pay the tax, the Mafia announced a "green light" authorizing violence toward gang members, both in prison and on the streets, until the tax was paid.   Because the Mafia had only 125 official members, it relied on associates— usually members of local Hispanic gangs—to collect taxes. Low-level associates were known as "surenos," higher-level associates as "camaradas," and official Mafia members as "carnales."   The leader of each local gang was responsible

---

[1] We have described the history and activities of the Mexican Mafia, also known as "La Eme," on several occasions.  *See, e.g.*, *United States v. Rodriguez*, 851 F.3d 931, 936 (9th Cir. 2017); *United States v. Martinez*, 657 F.3d 811, 815 (9th Cir. 2011); *United States v. Fernandez*, 388 F.3d 1199, 1215–16 (9th Cir. 2004); *United States v. Shryock*, 342 F.3d 948, 961 (9th Cir. 2003).

for ensuring payment of taxes.  Gangs raised tax money by selling drugs and robbing other drug dealers.

After some of the indicted defendants entered guilty pleas, two superseding indictments were filed charging some of the remaining defendants with additional crimes.  Eight defendants, including Barragan, Franco, Gutierrez, and Fernandez, eventually opted for trial.

## B.  Trial

The trial of appellants and four co-defendants lasted six weeks.  The government called over seventy witnesses and introduced tapes of hundreds of intercepted phone conversations, among other evidence.  We summarize the evidence against each appellant below.

### 1.  Evidence against Barragan

Local gang members and drug dealers testified that Barragan was the leader of the West Side gang, responsible for collecting Mafia taxes.  Barragan's statements in phone conversations confirmed his association with the Mafia.[2] West Side gang member Everst Cruz testified that Barragan instructed the gang to raise tax money by selling drugs and robbing other drug dealers, and that Barragan gave him a handgun "to collect the money and for whatever popped up."

Cruz testified that he regularly sold drugs and gave the proceeds to Barragan.  Intercepted phone conversations and text messages revealed that Barragan supplied drugs to West

---

[2] For example, Barragan told Gutierrez "I'm a camarada like you" and "I am working for" a Mafia member.

Side members.  On two occasions, members of the task force observed Barragan selling drugs.

Cruz also testified that he and other West Side members robbed local drug dealers and gave the money to Barragan. In phone conversations, Barragan told gang members whom to rob.  Cruz recounted one occasion where Barragan went to a drug dealer's house, "slapped him around," and took drugs and money.  In a subsequent phone call, the drug dealer lamented that Barragan had robbed him.

Cruz also testified that after members of a rival gang, the Diablos, beat up and stabbed West Side members, Barragan said "something needed to be done" and "he didn't care what we had to do."  Cruz then shot a Diablos member with the handgun Barragan had given him.

### 2.  Evidence against Franco

Franco was a high-ranking member of the Varrio Fallbrook Locos gang and an associate of the Mafia, according to intercepted phone conversations and his tattoos.[3]  Before the task force investigation began, Franco was in custody at the Vista detention facility.  While there, his statements in phone conversations indicated that he used his sister to smuggle drugs into the facility and to deliver money to the Mafia.[4]

---

[3] For example, Gutierrez stated that Franco is a "camarada" and "we give him our support."  Franco's tattoos stated, among other things, "gang related," "sureño," and "Old Town Fallbrook."

[4] For example, in a recorded call, Franco told his sister that "the presents will be all wrapped up" and instructed her to "hand it off" to an inmate who checked himself into the facility on weekends.  The inmate

During the task force investigation, Franco was incarcerated in state prison. A fellow inmate, Alfonso Mata, testified that he helped Franco collect taxes from drug-dealing inmates on behalf of the Mafia. At Franco's direction, Mata sent tax proceeds to Franco's mother, who then forwarded the money to a Mafia member. Receipts confirmed that Mata sent money to Franco's mother. Intercepted phone calls, taped conversations, and a bank statement confirmed that Franco's mother and sister then forwarded the money to a Mafia member.[5]

Despite his incarceration, Franco declared in a letter that the town of Fallbrook belongs to him and that his "amigo" in charge on the outside "has all our support." Mata also testified that Franco mentioned that his friend "Bullet" was dealing drugs "out in the neighborhood."

### 3. Evidence against Gutierrez

Intercepted phone conversations revealed that "Bullet" was Gutierrez. Like Franco, Gutierrez belonged to the Varrio Fallbrook Locos gang and was a Mafia associate, as demonstrated by phone conversations, his tattoos, and markings on his property.[6]

---

was later found to have drugs and a hypodermic needle in a package in his rectum. In another recorded call, Franco told his sister to deliver money to a Mafia member.

[5] For example, Franco's mother stated in an intercepted conversation that Franco's sister had $600 for a Mafia member. A bank statement showed a $600 deposit in the Mafia member's account the next day.

[6] For example, Gutierrez referred to himself as "the homey" at the Vista detention facility, and Barragan replied "I'm a camarada like you." Gutierrez's tattoos stated, among other things, "Fallbrook Locotis."

When the task force investigation began, Gutierrez was in custody at the Vista detention facility. While Gutierrez was there, the Mafia announced a green light against West Side members in the facility. Two inmates then assaulted Cruz. Cruz testified that an inmate told him that Gutierrez ordered the assault. Three weeks after the assault, Gutierrez told an inmate in a recorded conversation that the green light was lifted.

Once released, Gutierrez took orders from Franco. Recorded phone conversations indicated that Gutierrez helped smuggle drugs into the Vista detention facility, collected tax money from inmates, and delivered that money to Franco.[7] In one call, Gutierrez instructed an inmate to silence another inmate who was starting to talk to law enforcement.

### 4. Evidence against Fernandez

Fernandez conceded that he belonged to the Diablos gang. A former Diablos leader testified that in the fall of 2010, a Mafia member convened a meeting of Diablos members, instructing them to collect money from local drug dealers, using violence if necessary.

In an April 2011 phone conversation, Fernandez scheduled a meeting with the Diablos leader (Miguel

---

Markings on his notepad stated "FLS" and "13," signifying Fallbrook Locos and the thirteenth letter of the alphabet, M, for the Mafia.

[7] For example, in a recorded call, an inmate asked Gutierrez for "a card"; four days later, heroin was found in a greeting card sent to that inmate. Gutierrez also gave inmates his address and specified how much money to send. In a text message, Gutierrez told Franco's sister "I have 80 for your bro from Vista."

Grado), the leader of the Varrio San Marcos gang (Ivan Dunayevich), and a Varrio San Marcos member who was a government informant.   The informant secretly audio-recorded the meeting.  During the meeting, Fernandez and Grado informed Dunayevich that a drug dealer was using his name to avoid paying taxes.  Dunayevich expressed surprise, stating that the drug dealer had only sent him payment "maybe one time."  Fernandez then suggested: "Let's touch him up."   In a phone call seven days later, Grado told Barragan to rob the drug dealer and to "tell that fool that he's gonna start paying us."  Later that day, the drug dealer stated in a phone call that Barragan had robbed him.

In May 2011, the informant secretly audio-recorded a meeting in which Fernandez sold him heroin.  After handing over the drugs, Fernandez told the informant that he will have more heroin later and that he also has "crystal."  In June 2011, the informant secretly audio- and video-recorded a meeting in which Grado sold him methamphetamine. Although Fernandez cannot be seen on the video, a detective testified that he can be heard saying "What's up man" as the informant enters the room.  In July 2011, Fernandez told a fellow gang member in a recorded call that he wanted to "try" some methamphetamine and asked how much it would cost.

Five witnesses testified that in June 2011, a group of masked men who called themselves "Diablos" robbed them with a bat.  The men fled after police were called.  In a photo lineup, four of the witnesses failed to identify Fernandez as one of the attackers, but the fifth witness said she was "almost positive" that Fernandez was there.   Intercepted

calls from Fernandez's phone that night indicated that he participated in the robbery.[8]

## C. Convictions and Sentences

Barragan was convicted of the RICO conspiracy, conspiracy to distribute methamphetamine and cocaine, and two counts of distributing methamphetamine, but acquitted of assault, attempted murder, and discharge of a firearm in relation to a crime of violence. Franco and Gutierrez were convicted of the RICO conspiracy, the only charge against them. Fernandez was convicted of the RICO conspiracy, but acquitted of conspiracy to distribute methamphetamine.[9] The district court sentenced Barragan to 320 months in prison, Franco to 240 months, Gutierrez to 240 months, and Fernandez to 151 months. This timely appeal followed.

## II. CONVICTION ISSUES

## A. Wiretap Evidence

During the task force investigation, the district court authorized a wiretap of seven phones, including one used by Gutierrez. The wiretap application was supported by the affidavit of FBI agent Mathew Zeman, which described the suspected conspiracy, identified the investigative techniques

---

[8] For example, Fernandez asked a fellow Diablos member for a ride and stated "they're already callin' the cops"; he then asked another Diablos member whether he grabbed "the beater."

[9] One of the four other defendants tried with the appellants pleaded guilty during trial; two were convicted on some counts but acquitted on others; and one was convicted on all counts.

the task force had used to date, and explained the limitations of these and other potential techniques.

Gutierrez moved to suppress the wiretap evidence and for a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978), on whether Zeman's affidavit was materially misleading. The district court denied both motions. Gutierrez argues that (1) suppression was required because the affidavit failed to show that a wiretap was necessary, and (2) a *Franks* hearing was required because the affidavit contained false information.

### 1. Necessity of wiretap

"The government must show that every wiretap it seeks is necessary." *United States v. Christie*, 825 F.3d 1048, 1066 (9th Cir. 2016). An affidavit in support of a wiretap application must contain "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). The district court may authorize a wiretap only after determining that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." *Id.* § 2518(3)(c).

We review de novo whether an affidavit satisfies § 2518(1)(c). *Christie*, 825 F.3d at 1066. If the affidavit complies, we review for abuse of discretion a district judge's finding of necessity under § 2518(3)(c) and decision to authorize the wiretap. *Id.*

### a. Full and complete statement

Zeman's affidavit was sufficient under § 2518(1)(c). Twenty-four pages of the affidavit detailed the evidence the task force had uncovered during seven months of investigation.[10]    Another sixteen pages described the techniques used to date—including three confidential informants, two undercover officers, physical surveillance of suspects, review of recorded jail calls, pen registers, vehicle tracking devices, grand jury subpoenas, and mail covers—and explained why further use of these techniques would not reveal the full conspiracy.

Gutierrez argues that Zeman's affidavit merely gave boilerplate excuses for not using certain techniques. *See United States v. Blackmon*, 273 F.3d 1204, 1210 (9th Cir. 2001) (affidavit must describe more than "inherent limitations of normal investigative procedures").    But Zeman's reasons were largely case-specific.  For example, the affidavit stated that the spouse of one confidential informant was exposed as a government source, and the introduction of another informant caused conspirators to scale back their interactions with a third informant. Informants also faced the Mafia's penchant for violence; the affidavit recounted evidence that the Mafia (and Gutierrez) had recently arranged the stabbing of an informant in a different case.  Suspects were justifiably afraid to talk to police; an inmate identified as a possible source of information refused to cooperate with prosecutors after an

---

[10] This evidence included calls from a local jail to Gutierrez, in which Gutierrez discussed drug smuggling and Mafia activities in code. Thus, contrary to Gutierrez's suggestion, there was probable cause to believe that Gutierrez was violating the law and that a wiretap would intercept relevant communications.  *See* 18 U.S.C. § 2518(3)(a), (b).

assault by Mafia associates. Although undercover officers were able to buy drugs from conspirators, they could not infiltrate the Mafia because its members do not trust outsiders. Investigators conducted physical surveillance of conspirators, but could not get close enough to hear conversations, and the conspirators took counter-surveillance precautions such as meeting in enclosed spaces and making U-turns while driving. Pen registers revealed phone numbers the conspirators called, but many numbers were registered to false names.

To be sure, the Zeman affidavit also contained some boilerplate. "Some boilerplate language, however, is not fatal as we evaluate 'the level of detail in the affidavit as a *whole*.'" *United States v. Rodriguez*, 851 F.3d 931, 942 (9th Cir. 2017) (quoting *Christie*, 825 F.3d at 1068). Overall, the Zeman affidavit explained "in reasonable detail" why traditional investigative procedures had reached their limit. *Id.* at 943 (quoting *United States v. Rivera*, 527 F.3d 891, 899 (9th Cir. 2008)).

Gutierrez also argues that many of the investigatory techniques used by the task force were not utilized against him in particular. But no such requirement exists. It was sufficient for Zeman to explain "why certain techniques would be unproductive or too dangerous in regard to all of the target subjects . . . due to alleged associations with the Mexican Mafia." *Id.* at 940.

Gutierrez also attacks Zeman's affidavit because it did not mention that Gutierrez was monitored as a condition of his parole. But the fact that Gutierrez knew that he was being monitored suggests, if anything, that he would have been more discreet in communicating with conspirators, reinforcing the need for a wiretap. Zeman's omission of the monitoring was not "fatal to the affidavit as a whole" given

its "detailed discussion of most of the other investigative techniques." *Rivera*, 527 F.3d at 901.

### b. Finding of necessity

We accord district judges "considerable discretion in finding necessity, particularly when the case involves the investigation of a conspiracy." *Rodriguez*, 851 F.3d at 944 (quoting *United States v. Reed*, 575 F.3d 900, 909 (9th Cir. 2009)). The district court did not abuse that discretion here. Zeman's affidavit showed that the government used a "range of traditional techniques" and explained why continuing to do so "would be unproductive or dangerous given specific facts about the Mexican Mafia and the particular case." *Id.* The fact that the task force had "some degree of success" without a wiretap did not "extinguish the need for a wiretap." *Id.* at 943 (quoting *United States v. Bennett*, 219 F.3d 1117, 1122 (9th Cir. 2000)).

### 2. *Franks* hearing

To obtain a *Franks* hearing, Gutierrez was required to make a substantial preliminary showing that (1) Zeman's affidavit deliberately or recklessly included a false statement, and (2) the statement was material to the necessity finding. *Christie*, 825 F.3d at 1069. We review the denial of a *Franks* hearing de novo. *Id.*

Gutierrez did not show that Zeman's affidavit included a material false statement. Contrary to Gutierrez's assertions, Zeman's affidavit made clear that the target phone belonged to someone other than Gutierrez and that calls from the local jail were recorded. Although the affidavit omitted the fact that Gutierrez was subject to monitoring as a condition of his parole, "the district court would still have been reasonable to find the wiretap necessary" had this fact been included. *See*

*United States v. Shryock*, 342 F.3d 948, 977 (9th Cir. 2003). And, Gutierrez does not challenge the district court's finding that he failed to show that the omission was deliberate or reckless.

## B.  Joint Trial

The district court denied Fernandez's motions to try him separately from his co-defendants.  On appeal, Fernandez argues that the joint trial prejudiced him because most of the evidence implicated his co-defendants, not him.

"The district court's denial of a motion to sever is reviewed for an abuse of discretion."  *United States v. Fernandez*, 388 F.3d 1199, 1241 (9th Cir. 2004).  "The test for abuse of discretion by the district court is whether a joint trial was so manifestly prejudicial as to require the trial judge to exercise his discretion in but one way, by ordering a separate trial."  *Id.* (quoting *United States v. Baker*, 10 F.3d 1374, 1386 (9th Cir. 1993)).

This trial was not manifestly prejudicial.  A "joint trial is particularly appropriate where the co-defendants are charged with conspiracy."  *Id.* at 1242.  The district court instructed the jury to consider each defendant separately, reducing the possibility of prejudice.  *Id.* at 1243.  And the jury partially acquitted several defendants, including Fernandez, demonstrating its ability to compartmentalize.  *Id.* at 1242–43.[11]

---

[11] Fernandez also asserts, without citation to the record, that he was prejudiced by the "misbehavior" of co-defendant Jeremiah Figueroa during trial.  A co-defendant's misbehavior "usually will not compel a separate trial," unless the movant "can demonstrate the existence of some

## C. Testimony of Former Mafia Member

Before trial, the government moved in limine to allow former Mafia member Rene Enriquez to testify about the organization's structure and operation. The defense objected, arguing that Enriquez's testimony about the Mafia's violent history would be unfairly prejudicial. The district court overruled the objection.[12]

At trial, Enriquez recounted his rise through the Mafia hierarchy, explaining how members communicated with each other and enforced their rules through violence. He described several crimes he committed for the Mafia, including murder. On cross-examination, defense counsel elicited details of Enriquez's crimes. During closing argument, Fernandez's counsel asserted that the government had called Enriquez in order to "scare" the jury into convicting. In rebuttal, the prosecutor pointed out that it was the defense that focused on Enriquez's violent past.[13]

On appeal, Barragan, Franco, and Fernandez argue that Enriquez's testimony was irrelevant and unfairly prejudicial. Fernandez also argues that the prosecutor committed

---

special prejudice." *United States v. Pierro*, 32 F.3d 611, 616 (1st Cir. 1994) (collecting cases). Fernandez has not made that showing.

[12] The court did, however, prohibit Enriquez from testifying that the Mafia is a "terrorist organization."

[13] The prosecutor said: "Yes, we brought out that [Enriquez] had been convicted multiple times and he'd done crimes. For the two-and-a-half hours that he was subject to cross-examination by defense counsel, it was all their questions that kept bringing out these points."

misconduct when, in rebuttal, he blamed the defense for eliciting the testimony.

### 1. Unfair prejudice

Evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. But, a district court may exclude relevant evidence "if its probative value is substantially outweighed by . . . unfair prejudice." Fed. R. Evid. 403. We review a district court's application of Rule 403 with "considerable deference." *United States v. Fleming*, 215 F.3d 930, 938 (9th Cir. 2000) (quoting *United States v. Hankey*, 203 F.3d 1160, 1167 (9th Cir. 2000)).

The district court did not abuse its discretion in allowing Enriquez to testify on direct examination about his past crimes. The testimony was relevant because it laid the foundation for his knowledge of the Mafia and helped explain how the Mafia was able to enforce its taxation scheme: As he put it, "you pay or you die." Nor did the court abuse its discretion in finding that the probative value of the evidence was not substantially outweighed by any prejudice. The testimony was not "dragged in by the heels for the sake of its prejudicial effect." *United States v. Plascencia-Orozco*, 852 F.3d 910, 926 (9th Cir. 2017) (quoting *United States v. Haischer*, 780 F.3d 1277, 1282 (9th Cir. 2015)).

Franco argues that the prosecution spent most of its direct examination eliciting inflammatory testimony about Enriquez's violent past. In fact, however, most of the gory details were elicited on cross. In any event, the prosecution was entitled to draw the sting from this anticipated attack.

*See United States v. Feldman*, 788 F.2d 544, 555 (9th Cir. 1986).[14]

## 2. Prosecutorial misconduct

A prosecutor may not express his or her own opinion of the defendant's guilt or "denigrate the defense as a sham." *United States v. Hermanek*, 289 F.3d 1076, 1098 (9th Cir. 2002). Fernandez argues that the prosecutor improperly denigrated the defense when, in rebuttal, he blamed the defense for bringing up Enriquez's violent past. Because Fernandez did not raise this argument below, we review for plain error. *United States v. Tucker*, 641 F.3d 1110, 1120 (9th Cir. 2011).

We find no error, plain or otherwise. By pointing out that the defense brought up Enriquez's past, the prosecutor merely answered the defense charge that the government called Enriquez to "scare" the jury. "Criticism of defense theories and tactics is a proper subject of closing argument." *United States v. Sayetsitty*, 107 F.3d 1405, 1409 (9th Cir. 1997).

## D. Testimony of Investigating Agents

Before trial, the government moved to admit both expert and lay testimony from case agents about the meaning of code words used by the conspirators. The defense objected to the agents wearing "two hats"—as both expert and lay

---

[14] Franco also argues that Enriquez's testimony was improper propensity evidence because it suggested that Franco might have committed similar crimes. This argument misapplies the rule against using a defendant's *own* crimes as propensity evidence. *See United States v. Hodges*, 770 F.2d 1475, 1479 (9th Cir. 1985). Enriquez did not testify about crimes committed by Franco.

witnesses.  The district court granted the motion to admit expert testimony, and granted the motion to admit lay testimony "as long as it's based on personal observation and experience in listening in on the conversations of the case."

At the beginning of trial, the government clarified that it did not intend to offer the agents as experts, but would instead elicit their interpretations of code words as "lay opinion testimony based on their perceptions during the course of the investigation."  Throughout trial, the agents testified as to the meaning of words and phrases in the defendants' text messages and phone calls.[15]  The agents made clear that their interpretations were based on their review of hundreds of calls and text messages during the investigation.  The defense objected that the agents were giving expert opinions and that an instruction was necessary to distinguish between their lay and expert testimony.  The district court held that the agents' interpretations were lay opinions under Federal Rule of Evidence 701, and periodically instructed the jury that the opinions were based on the agents' own involvement in the investigation.

On appeal, Barragan and Gutierrez argue that the district court mistakenly classified the agents as lay witnesses and failed to differentiate the agents' "two hats."  Similarly,

---

[15] For example, Barragan's statement that a gang member "don't want to chip in" was interpreted to mean "not paying taxes."  Franco's statement to his sister that "the presents will be all wrapped up" was interpreted to mean "the drugs will be packaged and ready to go."  Gutierrez's statement to an inmate that he would "send the right scriptures to you guys" was interpreted to mean sending "drugs."  Fernandez's statement that he had "crystal" was interpreted to mean "methamphetamine."

Franco argues that the district court failed to instruct the jury as to the agents' "dual roles."

"The admissibility of lay opinion testimony under Rule 701 is committed to the sound discretion of the trial judge and his decision will be overturned only if it constitutes a clear abuse of discretion." *United States v. Gadson*, 763 F.3d 1189, 1209 (9th Cir. 2014) (quoting *Nationwide Transp. Fin. v. Cass Info. Sys., Inc.*, 523 F.3d 1051, 1058 (9th Cir. 2008)). The district court did not abuse its discretion in admitting the agents' testimony as lay opinion. An agent's "interpretations of ambiguous conversations based upon his direct knowledge of the investigation" are "lay testimony." *United States v. Freeman*, 498 F.3d 893, 904–05 (9th Cir. 2007); *accord Gadson*, 763 F.3d at 1206–09.[16]

Barragan argues that the district court should have treated the agents' testimony as expert opinion because the agents were interpreting "drug jargon," not simply "ambiguous conversations." *Freeman*, 498 F.3d at 901–02. But the line between lay and expert opinion depends on the basis of the opinion, not its subject matter. *See id.* at 902 (distinguishing between testimony based on "specialized knowledge" and testimony based on "general knowledge of the investigation"); Fed. R. Evid. 701(c) (lay testimony is "not based on . . . specialized knowledge"). Here, the agents

---

[16] Barragan contends that *Freeman* was incorrectly decided. *See Gadson*, 763 F.3d at 1223 (Berzon, J., concurring and dissenting) ("*Freeman*, in my view, goes much too far in allowing lay officer testimony concerning recorded conversations."). But a "three judge panel of this court cannot overrule a prior decision of this court." *In re Complaint of Ross Island Sand & Gravel*, 226 F.3d 1015, 1018 (9th Cir. 2000) (per curiam).

regularly tied their interpretations to their familiarity with the investigation. The district court thus had "ample grounds to conclude" that the agents based their interpretations on "personal knowledge of facts [they] learned during the investigation." *Gadson*, 763 F.3d at 1209–10.[17]

## E. Out-of-Court Statements of an Informant

At trial, the government sought to introduce tapes of conversations between a confidential informant and alleged conspirators, including Fernandez. Fernandez objected, arguing that the informant's statements were hearsay and their admission would violate the Confrontation Clause. The government asserted that the informant's statements were not being offered for their truth, but only to give context to other statements on the tapes. The district court overruled the objection "as long as the informant is talking to someone who's a co-conspirator," because "it doesn't make sense" to "play conversations and take one side out of it." At the close of trial, the court instructed the jury not to consider the informant's statements as evidence:

> Throughout the course of the trial, you have heard recordings that included statements made by government informants. It is the statements of those speaking to the government informants that is to be considered by you as evidence. Such statements should be considered by you in

---

[17] Franco asserts that the agents also gave expert opinions, but cites only one example: On cross-examination, when asked whether the Varrio San Marcos gang was associated with the Mafia before 2011, an agent said yes, based on past investigations. This testimony was not elicited by the government, and Franco does not explain how it prejudiced him.

relation to all the other instructions I provide, and you may give such statements as much weight as you think they deserve. Statements of government informants are not to be considered for their truth, but only to put the statements of those with whom they were talking into context.

On appeal, Fernandez renews his hearsay and Confrontation Clause arguments.

### 1. Hearsay

"Whether the district court correctly construed the hearsay rule is a question of law reviewable *de novo*. However, district courts are granted broad discretion in admitting evidence, and their rulings are reviewed only for an abuse of discretion." *United States v. Collicott*, 92 F.3d 973, 978 (9th Cir. 1996) (citation omitted).

The district court did not abuse its discretion in admitting the tapes. The co-conspirators' statements on the tapes were not hearsay. Fed. R. Evid. 801(d)(2)(E). And the informant's statements on the tapes were not hearsay because, as the court instructed the jury, they were offered only for context, not for "the truth of the matter asserted." Fed. R. Evid. 801(c)(2); *see United States v. Valerio*, 441 F.3d 837, 844 (9th Cir. 2006) (district court did not abuse discretion in admitting recorded conversation between informant and defendant and instructing jury not to consider informant's statements for their truth).

In particular, Fernandez attacks a statement made by the informant in a recorded call that Fernandez wanted to set up

a meeting between two local gangs.[18]   But the court's instruction prohibited the jury from considering the statement for its truth.   *See Valerio*, 441 F.3d at 844 ("Nothing the undercover informant said would be considered by the jury for its truth, but only to give context to what [the defendant] said, under the admonition.").   And other evidence independently demonstrated Fernandez's role in setting up the meeting:   In a subsequent recorded call, Fernandez set the meeting time and specified how many gang members would attend. *See id.* (noting that, although informant's statement could not be considered for its truth, other testimony could be used to prove the same proposition).

## 2.   Confrontation Clause

"We review de novo claimed violations of the Confrontation Clause." *United States v. Nielsen*, 371 F.3d 574, 581 (9th Cir. 2004).   The Clause "does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford v. Washington*, 541 U.S. 36, 59 n.9 (2004).   The informant's statements were not admitted for their truth, and "the admission of such context evidence does not offend the Confrontation Clause." *United States v. Tolliver*, 454 F.3d 660, 666 (7th Cir. 2006).

---

[18] A government agent also testified on direct examination that the informant told him that Fernandez wanted to set up the meeting.   But Fernandez did not object to this testimony.   And when Fernandez objected to similar testimony on cross-examination, the district court ultimately sustained the objection.

## F. Sufficiency of Evidence against Fernandez

Fernandez argues that the government failed to present sufficient evidence of his participation in the RICO conspiracy. "Where a defendant moves for acquittal at the close of the government's evidence, we review *de novo* whether sufficient evidence exists to support a guilty verdict." *United States v. Stewart*, 420 F.3d 1007, 1014 (9th Cir. 2005). In so doing, "we assess the evidence 'in the light most favorable to the prosecution,' determining whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* at 1014–15 (quoting *United States v. Orozco-Santillan*, 903 F.2d 1262, 1264 (9th Cir. 1990)).

The government presented sufficient evidence to sustain Fernandez's conviction. The jury heard testimony that a Mafia member instructed the Diablos gang (to which Fernandez belonged) to collect money from local drug dealers using violence if necessary. The jury heard taped conversations in which Fernandez subsequently scheduled a meeting with gang leaders at which he suggested "touching up" a recalcitrant drug dealer, who was robbed days later. The jury also heard taped conversations implicating Fernandez in at least one drug sale and a robbery. A rational juror therefore could have concluded that Fernandez "adopt[ed] the goal of furthering or facilitating" the Mafia's racketeering scheme. *United States v. Fernandez*, 388 F.3d 1199, 1229 (9th Cir. 2004) (quoting *Salinas v. United States*, 522 U.S. 52, 65 (1997)).

## G. Prosecutor's Remarks in Closing Argument

Before closing arguments, the district court instructed the jury that, among other things, they must decide the case

solely on the evidence and the lawyers' statements are not evidence. The prosecutor then began his closing as follows:

> It's been about five weeks since we first started. The Mexican Mafia started years and years ago, and it's going to keep going years and years from now. What brings us into this courthouse here today isn't some overblown, overinflated, or overtried attempt to try to end the Mexican Mafia for good. That's ridiculous.
>
> But for these defendants, for what they did to the community in 2010 and 2011, it's finally the chance to stand up and say no more. No more robbery. No more dealing and pedaling your meth to raise your money to buy your guns. No more committing extortion. No more beating the people of this community and firing guns down the street. No more. No more passing funds. No more meeting up and coordinating who's going to be able to tax who in what territory, so that you can then coordinate who gets the guns, who goes to the hotels and the 7-Elevens, who goes up to the AM/PM in the middle of the day to jack a drug dealer as he sits there with his one-year-old, but not a drug dealer. There's just no more, and it's the only reason that we are here today.

The defense objected, citing *United States v. Sanchez*, 659 F.3d 1252 (9th Cir. 2011); the court overruled the objection. The prosecutor then spent hours recounting the evidence against each defendant, occasionally making

remarks such as "no more," "it is time to put an end to that," and "enough is enough"; the court continued to overrule defense objections.

After the argument, the defense moved for a mistrial, arguing that the prosecutor improperly encouraged the jury to send a message of deterrence.  The court denied the motion and declined to give a specific curative instruction, but reminded the jury that lawyers' statements are not evidence and that "you are to decide this case solely on the facts as you find them . . . and you're not to base your decision on anything else."

Counsel for several defendants then responded to the prosecutor's remarks in their closing arguments.  For example, Fernandez's lawyer argued:

> And the government, the government, you'll recall, argued yesterday the only reason we are here, and they had some emotional reason for us to be here having to do with gangs or communities, but that's not true.  That's false.  The only reason we are here is to see if the government can prove the facts, every element of every offense, beyond a reasonable doubt.  That's the reason we're here.
>
> The government's argument yesterday was to ask you to convict because of prejudice and fear, and I'm here to tell you that you took an oath not to do that . . . .
>
> To be clear, the government wants to prejudice you.  Question, how do you convict someone without enough proof?  And by

proof, I don't mean emotionally.  By proof, I mean facts.  The answer is, you inflame the jury.  You scare them. . . .

Remember, these are some of the things the government argued to inflame you.  The Mexican Mafia will endure.  This is a chance to say no more.  This is the only reason we are here, which had to do with protecting the community.  It's time to say no more.  It's time to put an end to it.  Enough is enough.  This is about people who are touching this community with brutality.  It's time to say no more.  It only happens by you.  And all of that is to distract you from the lack of facts tying Hector Fernandez to any conspiracy. . . .

Why are they trying to scare you?  They're hoping you'll ignore the lack of facts presented, and it's an old prosecutor's trick.  In fact, those arguments are a reason to doubt the government's case against Hector Fernandez.  Stooping to those arguments is a reason to say the government hasn't proved it.[19]

---

[19] Similarly, Barragan's lawyer argued:

And contrary to what the government lawyer was saying yesterday, you don't have a responsibility to send a message to the Mexican Mafia.  You don't have a responsibility to send a message to Jesus Barragan.  You don't have a responsibility to send a message to anybody in this case.  You have a responsibility to

On appeal, all appellants argue that the prosecutor's remarks warrant reversal. "When the defendant objects to alleged prosecutorial misconduct, the standard of review is abuse of discretion." *United States v. Nobari*, 574 F.3d 1065, 1073 (9th Cir. 2009) (quoting *United States v. Steele*, 298 F.3d 906, 910 (9th Cir. 2002)). "Analysis of a claim of prosecutorial misconduct focuses on its asserted impropriety and substantial prejudicial effect." *United States v. Weatherspoon*, 410 F.3d 1142, 1145 (9th Cir. 2005).

## 1. Impropriety

The prosecutor's remarks crossed the line. "[P]rosecutors may not urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking. The evil lurking in such prosecutorial appeals is that the defendant will be convicted for reasons wholly irrelevant to his own guilt or innocence." *Sanchez*, 659 F.3d at 1256 (quoting *Nobari*, 574 F.3d at 1076); *see also* ABA Standards for Criminal Justice 3-6.8(c) (4th ed. 2015) ("The prosecutor should not make arguments calculated to appeal to improper prejudices of the trier of fact. The prosecutor should make only those arguments that are consistent with the trier's duty to decide the case on the evidence, and should not seek to divert the

---

evaluate the evidence dispassionately, but to arrive at a just verdict and to follow the law.

And counsel for co-defendant Hector Garcia argued:

The facts are overblown, and it is a case where the government has overtried and overtried, and they've done so with an absolutely cunning, calculating plan to scare you to death so you'll convict on nothing more than your fear.

trier from that duty."). Here, the prosecutor emphasized the violent nature of the defendants' crimes and repeatedly urged the jury to say "no more." Although the government argues that these remarks simply asked the jury to hold the defendants accountable for their actions, we disagree. Rather, statements like "No more beating the people of this community and firing guns down the street" invited the jury to convict for a non-evidentiary reason: to protect the community against future violence. "While commentary on a defendant's future dangerousness may be proper in the context of sentencing, it is highly improper during the guilt phase of a trial." *N. Mariana Islands v. Mendiola*, 976 F.2d 475, 487 (9th Cir. 1992), *overruled on other grounds by George v. Camacho*, 119 F.3d 1393, 1394 (9th Cir. 1997) (en banc).

## 2. Prejudice

"Inappropriate prosecutorial comments, standing alone, would not justify a reviewing court to reverse a criminal conviction obtained in an otherwise fair proceeding." *United States v. Young*, 470 U.S. 1, 11 (1985). We "must consider the probable effect the prosecutor's [comments] would have on the jury's ability to judge the evidence fairly," "within the context of the trial." *Id.* at 12.[20]

---

[20] We have described this standard in various ways. *See, e.g.*, *United States v. Alcantara-Castillo*, 788 F.3d 1186, 1190 (9th Cir. 2015) (improper remarks warrant reversal only if "it appears more probable than not that [they] materially affected the fairness of the trial" (quoting *United States v. Ruiz*, 710 F.3d 1077, 1082 (9th Cir. 2013))); *United States v. Del Toro-Barboza*, 673 F.3d 1136, 1150 (9th Cir. 2012) (improper remarks warrant reversal only if "they are so gross as probably to prejudice the defendant" (quoting *United States v. Navarro*, 608 F.3d 529, 535–36 (9th Cir. 2010))); *United States v. Tucker*, 641 F.3d 1110,

### a. Barragan, Franco, and Gutierrez

An "important factor contributing to the prejudicial effect of improper statements is the strength of the case against a defendant." *Sanchez*, 659 F.3d at 1260 (quoting *Weatherspoon*, 410 F.3d at 1151). The evidence against Barragan, Franco, and Gutierrez was overwhelming, and they do not argue otherwise. Thus, we conclude that the prosecutor's remarks did not prejudice them. *See Nobari*, 574 F.3d at 1082 (holding that prosecutor's remarks were harmless in light of "overwhelming" evidence against defendants).

### b. Fernandez

The evidence against Fernandez was not as overwhelming. Nonetheless, we conclude that it is not probable that the prosecutor's remarks prejudiced him. The evidence of his participation in the RICO conspiracy was quite substantial: Fernandez belonged to a gang which the Mafia had instructed to collect money from drug dealers, and he scheduled a meeting with gang leaders at which he suggested robbing a recalcitrant drug dealer. *See United States v. Koon*, 34 F.3d 1416, 1446 (9th Cir. 1994) ("[U]nlike cases in which there is little evidence on which the jurors could base a conviction, in this case there was substantial independent evidence to support a finding of

---

1120 (9th Cir. 2011) (improper remarks warrant reversal only if "it is more probable than not that [they] materially affected the verdict" (quoting *United States v. Tam*, 240 F.3d 797, 802 (9th Cir. 2001))). But, the basic inquiry is whether prejudice is probable, not just possible. *See United States v. Valle-Valdez*, 554 F.2d 911, 916 (9th Cir. 1977) (improper remarks by counsel are generally "nonconstitutional" error and therefore "measured against the more-probable-than-not standard").

guilt."), *rev'd in part on other grounds sub nom. Koon v. United States*, 518 U.S. 81 (1996).

We also consider "the substance of any curative instructions." *Sanchez*, 659 F.3d at 1257. A curative instruction can neutralize the harm of a prosecutor's improper statements if it is given "immediately after the damage [is] done" and mentions "the specific statements." *Id.* at 1258 (quoting *Weatherspoon*, 410 F.3d at 1151). Here, the district court's cautionary instruction—that lawyers' statements are not evidence and that the jury must decide the case solely on the facts—did not immediately follow or mention the challenged remarks, and therefore did not suffice by itself to neutralize any harm. *Id.* But, the instruction did come directly after the prosecutor's initial argument and reminded the jury of its proper role, thus reducing the risk that the jury would convict out of a concern for safety. *See United States v. Wright*, 625 F.3d 583, 613 (9th Cir. 2010) (general instruction that lawyers' statements are not evidence, given before and after closing argument, "mitigated" prosecutor's improper remarks), *superseded by statute on other grounds as recognized by United States v. Brown*, 785 F.3d 1337, 1351 (9th Cir. 2015).

Moreover, the prosecutor's remarks were less egregious than in cases where we have reversed. In *Sanchez*, *Weatherspoon*, and *Mendiola*, the prosecutor's appeal to non-evidentiary considerations was explicit and unmistakable. *See Sanchez*, 659 F.3d at 1256, 1259 (prosecutor argued that siding with the defendant would "send a memo to all drug traffickers" enabling their crimes; we described that as "a fully developed argument"); *Weatherspoon*, 410 F.3d at 1149 (prosecutor repeatedly argued that a conviction "is gonna make you comfortable knowing there's not convicted felons on the street with

loaded handguns"; we described that as an "entire line of argument, made even more indefensible by its repetition"); *Mendiola*, 976 F.2d at 486–87 (prosecutor argued "[t]hat gun is still out there. If you say not guilty, he walks out right out the door, right behind you"; we described that as "a far cry from a few unwise comments"). Here, the prosecutor's "no more" mantra impliedly invited the jury to consider community safety, but did not expressly urge them to do so. *Cf. United States v. de Cruz*, 82 F.3d 856, 862 (9th Cir. 1996) (holding that prosecutor's statement that crime "shouldn't go on" was "simply a way of saying that defendant had engaged in criminal conduct and should not be permitted to continue that criminal conduct").

In addition, the vast majority of the prosecutor's argument focused on the evidence. *See Koon*, 34 F.3d at 1445 (noting that "appellants have drawn a few sentences from a trial that lasted over a month and from detailed closing arguments that lasted many hours"). Fernandez's lawyer thoroughly responded to the improper remarks in his own closing. *Compare Wright*, 625 F.3d at 613 (improper comment "was mitigated by defense counsel's excellent rebuttal"), *with Sanchez*, 659 F.3d at 1261 (improper comment was "the last argument the jury heard before going to the jury room to deliberate"). And the jury acquitted Fernandez of one of the two charges against him, indicating that they reviewed the evidence objectively. *See Young*, 470 U.S. at 18 n.15 (partial acquittal "reinforces our conclusion that the prosecutor's remarks did not undermine the jury's ability to view the evidence independently and fairly"); *Wright*, 625 F.3d at 613 (same); *de Cruz*, 82 F.3d at 863 (same); *Koon*, 34 F.3d at 1446 (same).

In these circumstances, we conclude that the prosecutor's remarks, while improper, did not have a

"probable effect" on the jury's ability to judge the evidence fairly. *Young*, 470 U.S. at 12. Like the Second Circuit, "[w]e share the frustration voiced by commentators at the inability of some federal prosecutors to abide by well-established rules limiting the types of comments permissible in summation." *United States v. Modica*, 663 F.2d 1173, 1183–84 (2d Cir. 1981) (per curiam). But, like our sister circuit, "we disagree that the solution lies in reversing valid convictions." *Id.* at 1184. Although we find no reversible error here, we urge the government, trial judges, and professional licensing authorities to take seriously their responsibility to ensure that closing arguments in criminal cases focus on the evidence, not on broader considerations such as community safety. *See id.* at 1184–86 (describing remedies for prosecutorial misconduct, including reprimand, contempt penalties, disciplinary proceedings, and suspension).

We recognize—and lament—that in the absence of a reversal, some prosecutors may infer from today's opinion that whatever works is permissible. That would be the wrong conclusion; we today only conclude that the prosecutor's improper argument was limited in nature, addressed by the district court, and did not have a probable effect on the jury's verdict in light of the entire record. But forewarned is forearmed. On a different record, we will not hesitate to reverse or even suggest sanctions. *See, e.g.*, *Sanchez*, 659 F.3d at 1261 (reversing and remanding for new trial based on prosecutor's improper remarks).

## H. Requested Jury Instructions

The district court gave the jury twenty-two pages of instructions on the RICO charge. On appeal, Fernandez argues that the court erred in refusing to give certain instructions he requested.

A defendant is entitled to an instruction on a defense theory that (1) has some foundation in the evidence presented, (2) is supported by law, and (3) is not adequately covered by other instructions. *United States v. Thomas*, 612 F.3d 1107, 1120 (9th Cir. 2010). We review for abuse of discretion whether an instruction is grounded in the evidence, and de novo whether an instruction is supported by law or adequately covered by other instructions. *Id.* at 1120–22.

## 1. Conspiracy with informant

Relying on *United States v. Escobar de Bright*, 742 F.2d 1196 (9th Cir. 1984), Fernandez requested an instruction that he could not be convicted of conspiring with a government informant:

> A defendant in a criminal case can never be convicted of conspiring with a government agent or informant. Thus, I instruct you that you may not find that any defendant conspired with government informant Hector Cruz, aka "Troy."

This instruction misstates the law. *Escobar de Bright* held that a defendant who conspires "*only* with a government agent" is not guilty of conspiracy. 742 F.2d at 1197 (emphasis added). If at least one co-conspirator is not a government agent, a conspiracy conviction is permitted. *See United States v. Ching Tang Lo*, 447 F.3d 1212, 1225–26 (9th Cir. 2006). The district court did not abuse its discretion in finding that the evidence did not suggest Fernandez's involvement in the RICO conspiracy was limited to a conspiracy with a government informant. For example, Fernandez proposed "touching up" a drug dealer at a

meeting with two gang leaders, neither of whom was an informant.

## 2. Buyer-seller relationships

Relying on *United States v. Lennick*, 18 F.3d 814, 819 (9th Cir. 1994), and cases from other circuits,[21] Fernandez requested an instruction that his mere purchase of drugs did not establish participation in a conspiracy:

> The government has attempted to prove that on July 11, 2011 Hector Fernandez purchased narcotics. That transaction, if proved beyond a reasonable doubt, is insufficient to support a conspiracy charge if the evidence proves only that Mr. Fernandez purchased narcotics to use.

Similarly, relying on *United States v. Mincoff*, 574 F.3d 1186 (9th Cir. 2009), Fernandez requested an instruction that his mere sale of drugs did not establish participation in a conspiracy:

> The government has introduced evidence that Hector Fernandez sold heroin to government informant Hector Cruz, aka Troy on May 3, 2011. The sale of narcotics, standing alone, does not establish a conspiracy to distribute narcotics; rather, the government must establish beyond a reasonable doubt that the buyer and seller in a narcotics transaction had

---

[21] *United States v. Donnell*, 596 F.3d 913, 924–25 (8th Cir. 2010); *United States v. Bacon*, 598 F.3d 772, 777 (11th Cir. 2010) (per curiam); *United States v. Johnson*, 592 F.3d 749, 754 (7th Cir. 2010); *United States v. Deitz*, 577 F.3d 672, 680 (6th Cir. 2009).

an agreement to further distribute the narcotics in question or that the sale was made pursuant to a different conspiracy.

These instructions seem intended as a defense against the charge of conspiracy to distribute methamphetamine. Because Fernandez was acquitted of that charge, the failure to give these instructions did not prejudice him on that score.

To the extent the instructions were aimed at the RICO charge, the district court did not abuse its discretion in finding that the evidence did not suggest Fernandez's involvement in the conspiracy was limited to a mere purchase or sale of drugs. Moreover, a drug sale can be a predicate act supporting a RICO charge. *See* 18 U.S.C. § 1961(1). And the district court's detailed jury instructions, including the requirement that Fernandez "agreed that either [he] or a co-conspirator would conduct or participate, either directly or indirectly, in the conduct of the affairs of the [Mafia] enterprise through a pattern of racketeering activity," allayed any risk that the jury concluded that a mere drug purchase or sale was sufficient.

### 3. Victim of extortion

Relying on *Gebardi v. United States*, 287 U.S. 112 (1932), and cases from other circuits,[22] Fernandez requested an instruction that the government prove he was not a victim of extortion:

In general, a victim of extortion is not a participant (co-conspirator or aider and

---

[22] *United States v. Brock*, 501 F.3d 762 (6th Cir. 2007); *United States v. Spitler*, 800 F.2d 1267 (4th Cir. 1986).

abettor) in the extortion, even though payment may facilitate the activities of a RICO organization. Thus, the government must prove beyond a reasonable doubt any defendant charged in this case was not a victim of extortion.

This instruction was not supported by law. No case cited by Fernandez suggests that a low-level member of a RICO conspiracy can escape conviction simply because higher-ups exacted payment from him. *See Gebardi*, 287 U.S. at 119–23 (holding that a woman's consent to be transported for prostitution does not amount to a conspiracy with her transporter to violate the Mann Act); *United States v. Brock*, 501 F.3d 762, 766–71 (6th Cir. 2007) (holding that bribing a public official does not amount to a conspiracy with that official to extort the briber under the Hobbs Act); *United States v. Spitler*, 800 F.2d 1267, 1274–75, 1278 (4th Cir. 1986) (affirming conviction for aiding and abetting extortion under Hobbs Act where defendant was not "mere victim"). Moreover, the district court did not abuse its discretion in finding that the evidence did not suggest Fernandez was a mere victim of the racketeering scheme.

## I.   Unrequested "Anonymous Jury" Instruction

Before trial, the government moved to empanel an anonymous jury to ensure that the defendants would not harm or intimidate jurors. The district court held that jurors would be referred to in court by numbers only, but that the attorneys would be given the names of all prospective jurors in advance to do background checks, without divulging those names to their clients. Each prospective juror filled out a questionnaire that stated:

> All of the information in this questionnaire
> will be kept confidential. It will be reviewed
> only by the court and by the attorneys on each
> side. Neither your identities nor your
> answers will be released to the general public
> or the media.

During voir dire, the judge asked prospective jurors to hold up their numbers when speaking, explaining "I don't know your names. I only know your number." The judge excused Juror 3 on voir dire because she said she had a strong opinion against the Mafia, had a heart condition, and felt a little scared.

On the second day of trial, Juror 31 gave the judge a note: "I'm concerned that my child that attends San Marcos High . . . might be connected to me. If family members of the defendants see me pick him up at school, they may target him." In a private conversation with the judge, Juror 31 expressed doubt that he could be impartial but said he did not tell other jurors about his concerns. The judge excused Juror 31, telling the other jurors that he had "a conflict."

On the tenth day of trial, Juror 51 said he was concerned that people in the audience were texting, and Juror 13 said she feared that the trial was being recorded because she saw a phone sticking out of someone's shirt pocket. In response, the judge explained to the jury that "everyone in the audience knows and they have been admonished that they cannot record" and that the audience is allowed to "look at their e-mails and text as long as there is no abuse."

On appeal, Barragan and Franco argue that the district court's failure to give the jurors an explanation for their anonymity requires a new trial. Because this argument was

not raised below, we review for plain error. *United States v. Fuchs*, 218 F.3d 957, 961–62 (9th Cir. 2000).

We find no plain error. The risk in using an anonymous jury is that jurors "may infer that the dangerousness of those on trial required their anonymity, thereby implicating defendants' Fifth Amendment right to a presumption of innocence." *United States v. Shryock*, 342 F.3d 948, 971 (9th Cir. 2003). The district court must adopt reasonable safeguards to minimize this risk, such as telling the jury that the reason for their anonymity is to protect their privacy, or that anonymity is common in federal court. *Id.* at 972–73.

Here, the district court took some precautions. The questionnaire stated that jurors' information would be reviewed "by the court and by the attorneys" but not "released to the general public or the media," suggesting that the reason for anonymity was publicity-related. The court did not state that jurors' identities were being withheld from the defendants or that juror anonymity was unique to this case. The court repeatedly instructed the jury to presume innocence. Every time a juror expressed fear, the court either excused the juror or gave an explanatory instruction. We know of no case requiring more. *See United States v. Olano*, 507 U.S. 725, 734 (1993) (plain error must be "clear under current law").

## III.  SENTENCING ISSUES

## A.  Career Offender Enhancement

The district court sentenced Barragan and Gutierrez as career offenders. An adult defendant is a career offender under the sentencing guidelines if (1) "the instant offense of conviction is a felony that is either a crime of violence or a controlled substance offense," and (2) "the defendant has at

least two prior felony convictions of either a crime of violence or a controlled substance offense." U.S.S.G. § 4B1.1(a). We review a career offender finding de novo. *United States v. Mitchell*, 624 F.3d 1023, 1026 (9th Cir. 2010).

### 1. Barragan

Barragan does not contest that he was convicted of a controlled substance offense in this case. But, he challenges the district court's determinations that (1) his prior robbery conviction under California Penal Code § 211 was for a crime of violence, and (2) his prior drug trafficking conviction under California Health and Safety Code § 11379 was for a controlled substance offense.

### a. California Penal Code § 211 conviction

Section 211 defines robbery as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." In *United States v. Becerril-Lopez*, we held that a conviction under this section was categorically a crime of violence for purposes of U.S.S.G. § 2L1.2, which imposed an enhancement on aliens who unlawfully re-entered after committing a crime of violence. 541 F.3d 881, 889–93 (9th Cir. 2008). We observed that the commentary to § 2L1.2 defined "crime of violence" to include several specific offenses, including "robbery" and "extortion." *Id.* at 890.[23] And, we reasoned,

---

[23] Specifically, the commentary stated:

> "Crime of violence" means any of the following: murder, manslaughter, kidnapping, aggravated assault, forcible sex offenses, statutory rape, sexual

a conviction under California Penal Code § 211 necessarily involves either "robbery" or "extortion," generically defined. *Id.* at 891–92.

The career offender provision in effect at the time of Barragan's sentencing is similar to the guidelines provision at issue in *Becerril-Lopez*. The career offender provision defined "crime of violence" to include "extortion," and its commentary specified that "robbery" is also included. U.S.S.G. § 4B1.2(a) & cmt. n.1 (2012).[24]  Thus, a conviction

---

abuse of a minor, robbery, arson, extortion, extortionate extension of credit, burglary of a dwelling, or any offense under federal, state, or local law that has as an element the use, attempted use, or threatened use of physical force against the person of another.

U.S.S.G. § 2L1.2 cmt. n.1(B)(iii) (2005).

[24] Specifically, the text stated:

The term "crime of violence" means any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that—

(1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or

(2) is burglary of a dwelling, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another.

U.S.S.G. § 4B1.2(a) (2012).  The commentary stated in relevant part:

"Crime of violence" includes murder, manslaughter, kidnapping, aggravated assault, forcible sex offenses,

under California Penal Code § 211—which necessarily involves either generic robbery or generic extortion—was categorically a "crime of violence" for purposes of the career offender provision.

Barragan relies on *United States v. Dixon*, which held that a conviction under California Penal Code § 211 was not categorically a "violent felony" for purposes of the Armed Career Criminal Act. 805 F.3d 1193, 1195–98 (9th Cir. 2015). In *Dixon*, however, we distinguished *Becerril-Lopez* on the ground that the Act did not expressly include both robbery and extortion in its definition of "violent felony." *Id.* at 1196. That distinction is not applicable here; the commentary to the career offender provision included both crimes. U.S.S.G. § 4B1.2 cmt. n.1 (2012).

Barragan also cites *United States v. Soto-Rivera*, which declined to rely on the commentary to the career offender provision in defining "crime of violence." 811 F.3d 53, 59–61 (1st Cir. 2016). But the First Circuit reasoned that the commentary appeared to conflict with the text of the provision, given the government's concession that the residual clause in the text was unconstitutionally vague. *Id.* The Supreme Court has since held, however, that the residual clause of the career offender provision is not unconstitutionally vague. *Beckles v. United States*, 137 S. Ct. 886, 890 (2017). And, the text of the provision now

---

robbery, arson, extortion, extortionate extension of credit, and burglary of a dwelling.

*Id.* § 4B1.2 cmt. n.1 (2012).

expressly includes both "robbery" and "extortion." U.S.S.G. § 4B1.2(a) (2016).[25]

### b. California Health & Safety Code § 11379 conviction

California Health and Safety Code § 11379 prohibits transporting, importing, selling, furnishing, administering, or giving away certain drugs (or offering or attempting to do so). The government concedes that a violation of this section is not categorically a controlled substance offense. Thus, the government relies on the "modified categorical approach," which "allows courts to look beyond the statutory text to a limited set of documents to determine the elements of the state offense of which the defendant was convicted." *Rendon v. Holder*, 764 F.3d 1077, 1083 (9th Cir. 2014). Courts may use the modified categorical approach "only

---

[25] The current text states:

> The term "crime of violence" means any offense under federal or state law, punishable by imprisonment for a term exceeding one year, that—
>
> > (1) has as an element the use, attempted use, or threatened use of physical force against the person of another, or
> >
> > (2) is murder, voluntary manslaughter, kidnapping, aggravated assault, a forcible sex offense, robbery, arson, extortion, or the use or unlawful possession of a firearm described in 26 U.S.C. § 5845(a) or explosive material as defined in 18 U.S.C. § 841(c).

U.S.S.G. § 4B1.2(a) (2016).

when a statute is divisible—i.e., 'lists multiple, alternative *elements*, and so effectively creates several different crimes.'" *Id.* (alteration omitted) (quoting *Descamps v. United States*, 133 S. Ct. 2276, 2285 (2013)).

Barragan argues that § 11379 is not divisible. We recently rejected an identical argument in *United States v. Martinez-Lopez*, holding that an analogous provision of the California Health and Safety Code, § 11352, is "divisible with regard to both its controlled substance requirement and its actus reus requirement." 864 F.3d 1034, 1044 (9th Cir. 2017) (en banc). Thus, after reviewing the judicially noticeable records of Barragan's § 11379 conviction, the district court properly concluded that the conviction was for selling methamphetamine, a controlled substance offense. U.S.S.G. § 4B1.2(b).[26]

---

[26] Because Barragan was a career offender, he faced a 360-months-to-life guidelines range for one of his drug convictions in this case: distributing more than 50 grams of pure methamphetamine (Count 8). *See* U.S.S.G. § 4B1.1(b); 21 U.S.C. § 841(b)(1)(A)(viii); U.S.S.G. ch. 5, pt. A. The district court correctly calculated this range. The court also calculated a 360-months-to-life range for his RICO conviction (Count 1), a 360-months-to-life range for his drug conspiracy conviction (Count 6), and a 262-to-367-months range for his other drug distribution conviction (Count 7), ultimately sentencing him to 320 months on all counts to run concurrently.

Barragan argues that the district court failed to group his drug offenses together when calculating guidelines ranges. But, because he faced a 360-months-to-life range for one of his drug convictions, any such error was harmless. *See United States v. Seljan*, 547 F.3d 993, 1007 (9th Cir. 2008) (en banc) (possible grouping error did not require resentencing because "the result would have been the same either way").

### 2. Gutierrez

The government concedes that the district court erred in classifying Gutierrez as a career offender because his conviction in this case was not for a crime of violence or a controlled substance offense. We agree, vacate Gutierrez's sentence, and remand for resentencing on an open record. *See United States v. Matthews*, 278 F.3d 880, 885–86 (9th Cir. 2002) (en banc).[27]

## B. RICO Conspiracy Sentencing

Through its verdicts of guilt on the RICO charge, the jury necessarily found that each defendant agreed that he or a co-conspirator would participate in Mafia affairs through a "pattern of racketeering activity," also known as predicate acts. 18 U.S.C. § 1962(c), (d). Under the sentencing guidelines, the offense level for a RICO conspiracy conviction may depend on which predicate acts were reasonably foreseeable and attributable to a defendant. *See* U.S.S.G. § 2E1.1 (setting base offense level for RICO conviction at either 19 or "the offense level applicable to the underlying racketeering activity," whichever is greater); *United States v. Carrozza*, 4 F.3d 70, 74–77 (1st Cir. 1993) (explaining that the term "underlying racketeering activity" refers to any predicate act that is relevant conduct under U.S.S.G. § 1B1.3). The indictment in this case alleged many predicate acts, but the jury verdicts did not specify which were attributable to any particular defendant. At sentencing, the district court found certain predicate acts attributable to

---

[27] We therefore do not treat Gutierrez's other attacks on his sentence. *See United States v. Munoz-Camarena*, 631 F.3d 1028, 1031 (9th Cir. 2011) (per curiam).

each defendant, based on a preponderance of the evidence presented at trial.

## 1. Findings of predicate acts

Barragan and Franco argue that the district court erred in attributing to them predicate acts that the jury verdicts did not. Similarly, Barragan argues that the court erred in attributing to him predicate acts of which he was acquitted or which were not formally charged in the indictment. These arguments fail.

District courts are generally "free to make factual determinations not made by the jury and may base their ultimate decisions regarding the length of a convicted criminal's sentence on these determinations." *United States v. Staten*, 466 F.3d 708, 719 (9th Cir. 2006). Like our sister circuits, we have held that district courts may consider criminal conduct that the jury did not find—indeed, even conduct for which the jury acquitted—in setting the offense level for RICO sentences. *See United States v. Mercado*, 474 F.3d 654, 657 (9th Cir. 2007) (holding that "the district court could constitutionally consider the acquitted conduct" in RICO sentencing);[28] *Carrozza*, 4 F.3d at 77 (holding that "underlying racketeering activity" in RICO guidelines includes "any act, whether or not charged against defendant personally, that qualifies as a RICO predicate act under 18 U.S.C. § 1961(1) and is otherwise relevant conduct under § 1B1.3" (footnote omitted)); *United States v. Pica*, 692 F.3d 79, 88 (2d Cir. 2012) (holding that "district court may treat

---

[28] Barragan contends that *Mercado* was incorrectly decided. *See Mercado*, 474 F.3d at 660 (B. Fletcher, J., dissenting) ("I conclude that the consideration of acquitted conduct violates the Sixth Amendment."). But, we cannot overrule a previous decision of this court. *In re Complaint of Ross Island Sand & Gravel*, 226 F.3d at 1018.

acquitted conduct as relevant conduct at sentencing"); *United States v. Massimino*, 641 F. App'x 153, 168 (3d Cir. 2016) (non-precedential) (holding that sentencing court "is permitted to consider evidence of both uncharged acts and evidence underlying counts on which the defendant has been acquitted"); *United States v. Tocco*, 306 F.3d 279, 286 (6th Cir. 2002) (explaining that "underlying racketeering activity" in RICO guidelines includes reasonably foreseeable acts of co-conspirators as determined by district court); *United States v. Darden*, 70 F.3d 1507, 1545 (8th Cir. 1995) (noting that "district court may consider uncharged, relevant conduct" at sentencing (quoting *United States v. Ballew*, 40 F.3d 936, 943 (8th Cir. 1994)).[29]

Franco cites a footnote from one of our opinions stating that two other circuits "have suggested that it is the duty of the government to seek a special verdict when the information sought is relevant to the sentence to be imposed." *United States v. Vasquez-Velasco*, 15 F.3d 833, 847 n.11 (9th Cir. 1994). But we distinguished those cases as involving either a "count that charged the violation of more than one statutory provision" or a "count that charged the violation of a single conspiracy statute that has more than one object." *Id.* Neither is the case here.[30]

---

[29] Although the Sixth Amendment requires that the jury decide any fact which "increases the penalty for a crime beyond the prescribed statutory maximum," *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), or which "increases the mandatory minimum," *Alleyne v. United States*, 133 S. Ct. 2151, 2155 (2013), appellants identify no instance in which the district court usurped this role.

[30] RICO conspiracies are "single object" conspiracies. *United States v. Fernandez*, 388 F.3d 1199, 1260 n.45 (9th Cir. 2004) (quoting *United States v. Corrado*, 227 F.3d 528, 541–42 (6th Cir. 2000)).

## 2. Standard of proof

Barragan, Franco, and Fernandez also argue that the district court was required to find facts beyond a reasonable doubt. These arguments fail.

"Ordinarily, a district court uses a preponderance of the evidence standard of proof when finding facts at sentencing . . . ." *United States v. Treadwell*, 593 F.3d 990, 1000 (9th Cir. 2010). Appellants urge us to follow the Eleventh Circuit, which requires district courts to use a beyond-a-reasonable-doubt standard when determining predicate acts after a general verdict. *United States v. Nguyen*, 255 F.3d 1335, 1340–42 (11th Cir. 2001). *Nguyen* reached that conclusion by analogizing to a situation where a defendant is "convicted of a multi-object conspiracy," *id.* at 1341, in which case a general provision of the guidelines governs:

> A conviction on a count charging a conspiracy to commit more than one offense shall be treated as if the defendant had been convicted on a separate count of conspiracy for each offense that the defendant conspired to commit.

U.S.S.G. § 1B1.2(d).[31]

We decline the invitation; "every other circuit to consider the question has held that § 1B1.2(d) does not apply to RICO conspiracies." *United States v. Garcia*, 754 F.3d

---

[31] The commentary to § 1B1.2(d) explains that the provision "should only be applied with respect to an object offense alleged in the conspiracy count if the court, were it sitting as a trier of fact, would convict the defendant of conspiring to commit that object offense." U.S.S.G. § 1B1.2 cmt. n.4.

460, 482 (7th Cir. 2014) (citing *Carrozza*, 4 F.3d at 79–80; *United States v. Massino*, 546 F.3d 123, 135 (2d Cir. 2008) (per curiam); *United States v. Corrado*, 227 F.3d 528, 541–42 (6th Cir. 2000)).  These circuits correctly reject *Nguyen*'s analogy to a multi-object conspiracy because "RICO conspiracies are of the single-object variety, with the object being to engage in racketeering.  The predicate racketeering acts are not, in themselves, conspiratorial objects."  *Id.* Consistent with that characterization, we have described RICO conspiracies as "single object" conspiracies.  *United States v. Fernandez*, 388 F.3d 1199, 1260 n.45 (9th Cir. 2004) (quoting *Corrado*, 227 F.3d at 541–42); *see also United States v. Zemek*, 634 F.2d 1159, 1170 n.15 (9th Cir. 1980) ("The essence of a RICO conspiracy is not an agreement to commit predicate crimes but an agreement to conduct or participate in the conduct of the affairs of an enterprise through a pattern of racketeering.").

Barragan and Franco argue in the alternative that the district court was required to find facts by clear and convincing evidence.  "[W]here an extremely disproportionate sentence results from the application of an enhancement, the government may have to satisfy a 'clear and convincing' standard." *Treadwell*, 593 F.3d at 1000 (quoting *United States v. Zolp*, 479 F.3d 715, 718 (9th Cir. 2007)).  "We impose this requirement to ensure that legislatures 'cannot evade [the constitutionally required standard of proof] by reclassifying an element of a crime as a sentencing factor,' thereby depriving a defendant of important criminal procedural protections." *Id.* (alteration in original) (quoting *United States v. Harrison-Philpot*, 978 F.2d 1520, 1523 (9th Cir. 1992)).  Whether the clear-and-convincing standard is required depends on the totality of the circumstances, which include:

(1) whether the enhanced sentence falls within the maximum sentence for the crime alleged in the indictment;

(2) whether the enhanced sentence negates the presumption of innocence or the prosecution's burden of proof for the crime alleged in the indictment;

(3) whether the facts offered in support of the enhancement create new offenses requiring separate punishment;

(4) whether the increase in sentence is based on the extent of a conspiracy;

(5) whether an increase in the number of offense levels is less than or equal to four; and

(6) whether the length of the enhanced sentence more than doubles the length of the sentence authorized by the initial sentencing guideline range in a case where the defendant would otherwise have received a relatively short sentence.

*Id.*

The main hurdle for appellants is the fourth factor. "We have repeatedly held that sentencing determinations relating to the extent of a criminal conspiracy need not be established by clear and convincing evidence." *Id.* at 1001. The first and second factors also weigh against appellants, as their sentences are less than the maximum and do not negate the

presumption of innocence or the prosecution's burden of proof for the RICO conspiracy.

The third factor arguably favors appellants, because many of the predicate acts found by the district court could have been charged as separate offenses. But the court found only that the acts were attributable to the defendants as part of the RICO conspiracy, not that the defendants committed the acts. Moreover, the defendants had the opportunity to dispute the existence or relevance of these acts, because the district court's fact-finding "was based on the evidence presented at trial on the conspiracy charge." *Id.*

The fifth factor favors appellants, especially Franco. Franco asserts that the district court's fact-finding increased his offense level by seventeen; Barragan asserts that the fact-finding increased his offense level by eight; the government does not dispute either assertion. The sixth factor also favors Franco. He asserts, and the government does not dispute, that his ultimate sentence was four times the initial guidelines range.[32]

In these circumstances, our previous decisions indicate that the clear-and-convincing standard was not required. In *Treadwell*, the defendants were convicted of a Ponzi scheme and the district court imposed a 22-level enhancement based on the amount of money it deemed lost, increasing the Guidelines range from 30–37 months to 324–405 months. 593 F.3d at 994–95 & 1001 n.8. Despite the severity of the enhancement, we approved the preponderance-of-evidence standard, explaining: "The loss enhancement is based on a conspiracy conviction, and [the defendants] had ample

---

[32] Barragan concedes that the sixth factor does not favor him, as his sentence was not doubled.

opportunity at trial to challenge the government's evidence of the extent of losses caused by the conspiracy. . . . The enhancement was large, but that alone does not raise the due process concerns that urge 'clear and convincing' proof." *Id.* at 1001–02. Similarly, in *Harrison-Philpot*, the defendant was convicted of drug charges and the district court imposed an 18-level enhancement based on the amount of drugs it deemed involved, increasing the guidelines range from 41–51 months to 292–365 months. 978 F.2d at 1522. Again, we approved the preponderance-of-evidence standard: "Harrison-Philpot was charged and convicted of conspiracy; the extent of the conspiracy caused the tremendous increase in her sentence." *Id.* at 1523. Here too, then, the district court was permitted to find facts relating to the extent of the conspiracy by a preponderance of evidence.[33]

## IV. CONCLUSION

We affirm the convictions of all appellants; affirm the sentences of Barragan,[34] Franco,[35] and Fernandez; and vacate Gutierrez's sentence and remand for resentencing on an open record.

---

[33] Barragan also argues that one of the district court's findings was erroneous under the preponderance-of-evidence standard. We disagree. The district court did not clearly err in determining that, when Barragan gave a gun to Cruz and told him it was "to collect the money and for whatever popped up," an attempted murder was reasonably foreseeable.

[34] Barragan's reply brief cites two recent guidelines amendments. If Barragan believes these amendments affect his sentence, he may seek relief from the district court in the first instance. *See United States v. Boykin*, 785 F.3d 1352, 1364 n.9 (9th Cir. 2015).

[35] We do not consider Franco's claim of credit for time served in state custody, which he has informed us is moot.